[846 NE2d 794, 813 NYS2d 349]

In the Matter of M.B. MENTAL HYGIENE LEGAL SERVICE, Appellant; STATEN ISLAND DEVELOPMENTAL DISABILITIES SERVICES OFFICE et al., Respondents.

Argued February 16, 2006; decided March 23, 2006

438

**POINTS OF COUNSEL**

*Mental Hygiene Legal Service,* Mineola (*Lisa Volpe, Sidney Hirschfeld* and *Dennis B. Feld* of counsel), for appellant. I. The Surrogate's Court and appellant have ignored significant language in SCPA 1750-b, thus failing to give full meaning to the statutory amendments at issue. (*Matter of B,* 190 Misc 2d 581.) II. Under the case law established by this Court, the amended SCPA 1750 and the newly enacted SCPA 1750-b cannot be applied retroactively. (*People v Behlog,* 74 NY2d 237; *People v Oliver,* 1 NY2d 152; *Matter of Marino S.,* 100 NY2d 361, 540 US 1059; *Matter of Gleason [Michael Vee, Ltd.],* 96 NY2d 117; *Matter of Duell v Condon,* 84 NY2d 773; *Jacobus v Colgate,* 217 NY 235; *Shielcrawt v Moffett,* 294 NY 180; *Matter of Storar,* 52 NY2d 363; *Matter of Fosmire v Nicoleau,* 75 NY2d 218.)

*Eliot Spitzer, Attorney General,* New York City (*Jean Lin, Caitlin Halligan* and *Daniel Smirlock* of counsel), for respondent. I. The plain language of the Health Care Decisions Act for Persons with Mental Retardation authorizes SCPA article 17-A guardians to make all health care decisions on behalf of their wards, regardless of when the guardians were appointed. (*McCluskey v Cromwell,* 11 NY 593; *New Amsterdam Cas. Co. v Stecker,* 3 NY2d 1; *Meltzer v Koenigsberg,* 302 NY 523; *Finger*

*Lakes Racing Assn. v New York State Racing & Wagering Bd.,* 45 NY2d 471.) II. The legislative history of the Health Care Decisions Act for Persons with Mental Retardation confirms that the act is intended to cover SCPA article 17-A guardians appointed both before and after the effective date of the act. (*Matter of Storar,* 52 NY2d 363; *Matter of Fosmire v Nicoleau,* 75 NY2d 218; *Blouin ex rel. Estate of Pouliot v Spitzer,* 356 F3d 348.) III. The Appellate Division's decision contravenes both the plain meaning and purpose of the Health Care Decisions Act for Persons with Mental Retardation. (*Matter of Storar,* 52 NY2d 363.)

**OPINION OF THE COURT**

GRAFFEO, J.

Under the Health Care Decisions Act for Persons with Mental Retardation, a guardian can make health care decisions for a mentally retarded person, including the decision to terminate life-sustaining medical treatment, under carefully prescribed circumstances. The issue in this case—solely one of statutory interpretation—is whether the Act applies only to guardians appointed after its March 2003 effective date or whether it also affects the authority of persons already serving as guardians before March 2003. Based on the language and history of the Act, we conclude that the Legislature also granted existing guardians full health care decision-making authority, subject to the detailed procedures set forth in the statute.

## Background

Under New York common law, a competent adult generally has the right to make health care decisions, including the right to refuse life-sustaining treatment (*see Matter of Fosmire v Nicoleau,* 75 NY2d 218 [1990]). If the individual suffers an illness or injury resulting in a loss of decision-making capacity, family and friends may obtain a court order authorizing the cessation of treatment if they can prove—by clear and convincing evidence of the patient's previously-expressed views—that the individual would have refused life-sustaining treatment if capable of making that decision (*id.* at 225).[1]

---

1. In addition to the rights recognized under the common law, a competent adult can, of course, relieve family and friends of the burden of seeking such a court order by executing a health care proxy pursuant to Public Health Law § 2981 naming a surrogate health care decision-maker who can make binding decisions in the event the appointing adult loses the capacity to make such de-

Although a guardian of a mentally retarded person was imbued under the common law with the authority to make a broad spectrum of health care decisions, this authority did not encompass the power to end life-sustaining medical treatment. Viewing the guardian's role as comparable to that of a parent— who could not deprive a child of lifesaving treatment—this Court concluded in *Matter of Storar* (52 NY2d 363 [1981], *cert denied* 454 US 858 [1981]) that the guardian of a 52-year-old mentally retarded man lacked the authority to order the cessation of blood transfusions. Predicating our analysis on principles developed under the common law, we indicated that the Legislature could establish procedures governing the discontinuance of life-sustaining treatment for incompetent individuals if it determined this was desirable or appropriate, noting that any "change should come from the Legislature" (*id.* at 383).

In the wake of *Storar*, a distinction arose between the common-law rights of competent adults, who could make their wishes concerning end-of-life care known to family and friends, and mentally retarded persons who had never been competent to make their own health care decisions and for whom life-sustaining treatment could not be refused. When these mentally retarded individuals became irreversibly, terminally ill they were, in effect, ineligible for hospice or other palliative care because their guardians were unable to refuse more intrusive, acute medical treatments aimed at extending life for as long as possible.

As a consequence of this disparity, family members, caregivers and advocacy groups for the mentally retarded sought relief from the Legislature. They shared the stories of mentally retarded patients forced to suffer painful, intrusive life-sustaining medical treatments after it was clear that they would never regain any quality of life because the requests of their guardians (usually parents or siblings) to end life-sustaining measures could not be honored. This was the situation the Legislature sought to remedy when it enacted the Health Care Decisions Act for Persons with Mental Retardation (HCDA) (*see* Bill Jacket, L 2002, ch 500).

---

cisions. A person can also express his or her wishes regarding life-sustaining treatment in what is known as a "living will."

### The Statutory Scheme

The HCDA was passed by both houses and signed by the Governor in the fall of 2002 but it did not become effective until 180 days later—March 16, 2003 (L 2002, ch 500, § 4). The legislation added a new subdivision to Surrogate's Court Procedure Act § 1750, the provision that addresses the guardianship of mentally retarded persons. Before the enactment of the HCDA, section 1750 stated that, upon the certification of appropriate medical personnel that a mentally retarded person was "incapable to manage him or herself and/or his or her affairs by reason of mental retardation and that such condition is permanent in nature or likely to continue indefinitely," a guardian "of the person or of the property or of both" could be appointed (SCPA 1750 [1]). A guardianship "of the person" was viewed as authorizing some degree of medical decision-making power, but the scope of this authority was unclear, particularly in the aftermath of *Storar.*

The new provision—SCPA 1750 (2)—imposes an additional certification requirement, clearly applicable to all future guardianship proceedings. Along with filing a certification from medical professionals that the mentally retarded person is incapable of managing his or her affairs, prospective guardians now must also file a "specific determination by such [medical personnel] as to whether the mentally retarded person has the capacity to make health care decisions, as defined by [Public Health Law § 2980 (3)], for himself or herself" (SCPA 1750 [2]). In the event the mentally retarded individual has the ability to make health care decisions, the HCDA allows a guardian to be appointed to make other types of decisions. If not, the guardian is granted full medical decision-making power. In the latter event, the HCDA removed any uncertainty concerning the scope of that authority, clarifying that health care decisions include "any decision to consent or refuse to consent to health care" (*see* SCPA 1750-b [1], cross-referencing Public Health Law § 2980 [6]). Thus, under the HCDA, a guardian can, under certain circumstances, order the cessation of life-sustaining medical treatment for a mentally retarded person who never had capacity to make such a decision.

The HCDA also amended article 17-A of the Surrogate's Court Procedure Act by adding a new section 1750-b governing health care decision-making for mentally retarded persons. Section 1750-b establishes a "[d]ecision-making standard" requiring that guardians base all health care decisions "solely and

exclusively on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs" (SCPA 1750-b [2] [a]). This provision lists the factors that must be considered in determining the mentally retarded person's best interests, which include "the dignity and uniqueness" of the individual; "the preservation, improvement or restoration of the . . . person's health"; "the relief of the mentally retarded person's suffering by means of palliative care and pain management"; the effect of treatment, including artificial nutrition and hydration, on the mentally retarded person; and the patient's overall medical condition (SCPA 1750-b [2] [b]). A medical decision cannot be based on financial considerations or a failure to afford the mentally retarded individual the respect that would be afforded any other person in the same circumstances (SCPA 1750-b [2] [c]). In addition, the statute imposes on the guardian "the affirmative obligation to advocate for the full and efficacious provision of health care, including life-sustaining treatment" (SCPA 1750-b [4]), defined as "medical treatment which is sustaining life functions and without which, according to reasonable medical judgment, [the] patient will die within a relatively short time period" (*see* SCPA 1750-b [4], cross-referencing Mental Hygiene Law § 81.29 [e]).

In the event a guardian contemplates the withdrawal or withholding of life-sustaining treatment, SCPA 1750-b imposes a decision-making procedure that must be followed before the decision can be carried out. The threshold requirement is that the mentally retarded person's physician confirm to a reasonable degree of medical certainty, after consultation with another physician or a licensed psychologist, that the person currently lacks the capacity to make health care decisions (SCPA 1750-b [4] [a]). The attending physician and another concurring physician must further attest that the mentally retarded person has one of three types of conditions: a terminal condition, permanent unconsciousness or "a medical condition other than such person's mental retardation which requires life-sustaining treatment, is irreversible and which will continue indefinitely," and life-sustaining treatment imposes or would impose an extraordinary burden on the patient in light of the patient's medical condition and the expected outcome of the life-sustaining treatment (SCPA 1750-b [4] [b] [i], [ii]). In the case of the withdrawal or withholding of artificially provided nutrition or hydra-

tion, the two physicians must also confirm that "there is no reasonable hope of maintaining life" or that the artificial nutrition or hydration itself "poses an extraordinary burden" on the patient (SCPA 1750-b [4] [b] [iii]). These conclusions by medical professionals are a condition precedent to any valid decision to end life-sustaining treatment—without them, life-sustaining treatment must be afforded to the patient.

If the requisite medical conclusions are made, the next step is for the guardian to express a decision to end life-sustaining treatment either in writing, signed by a witness, or orally in the presence of the attending physician and another witness, and the decision must be included in the patient's chart. The physician can then issue the appropriate medical orders or object to the guardian's decision but, in either case, the decision to end life-sustaining treatment cannot be implemented for 48 hours (SCPA 1750-b [4] [e]). During that time, the physician must notify various parties including, in some circumstances, the mentally retarded person. The Act grants a number of persons and organizations automatic standing to lodge an objection—the mentally retarded person, a parent or adult sibling, the attending physician, any other health care practitioner providing services to the patient, the director of a residential facility that formerly cared for the patient, the Commissioner of the Office of Mental Retardation and Developmental Disabilities (OMRDD), and, if the patient was treated in a residential facility, the Mental Hygiene Legal Service (MHLS) (SCPA 1750-b [5]).

Upon objection, the guardian's decision is suspended (unless the suspension would itself result in the death of the patient) while a judicial proceeding is conducted "with respect to any dispute arising under this section, including objecting to the withdrawal or withholding of life-sustaining treatment because such withdrawal or withholding is not in accord with the criteria set forth in this section" (SCPA 1750-b [6]). If at the conclusion of the 48-hour period there is no objection the guardian's decision to withdraw or withhold life-sustaining treatment is put into effect, without judicial involvement.

Thus, the HCDA clarifies that guardians can make health care decisions for mentally retarded persons who themselves were never competent to make those decisions, including a decision to end life-sustaining treatment. But it imposes a series of procedural hurdles—intended to safeguard the interests of the patient and prevent an improvident decision by the guardian—

that must be satisfied prior to the implementation of such a decision.

The issue now presented to us is whether the Legislature intended to authorize guardians appointed prior to the effective date of the HCDA to make health care decisions for mentally retarded persons in accordance with the Act's strict decision-making structure without having to obtain, through a separate judicial proceeding, an amended guardianship order that specifically recognizes their authority as encompassing the power to end life-sustaining treatment. We conclude that the Legislature did intend that authorization.

## Facts

M.B., a profoundly retarded 42-year-old man with Down's syndrome who never possessed the capacity to make health care decisions, lived with his mother until her death in December 2002. In January 2003, M.B.'s brother R.B. was appointed his guardian under article 17-A of the Surrogate's Court Procedure Act. At that time, the HCDA had been passed but was not yet effective. The guardianship decree therefore named R.B. as "guardian of the person" of M.B. but the court did not specifically address R.B.'s authority to make health care decisions for M.B.

After his mother's death, M.B. lived in a residential facility specializing in the care of mentally retarded persons. He later became seriously ill and was transferred to Staten Island University Hospital where he was diagnosed with pneumonia, hypertension and hypoxia. His physical condition steadily declined to the point that he lost consciousness and was placed on a respirator, with a nasal-gastric tube inserted for feeding and hydration. M.B.'s physicians concluded that his illness was terminal, his condition irreversible and that the life-sustaining treatment currently being provided imposed a substantial burden on him. Based on the physicians' opinions concerning M.B.'s medical condition and prognosis, on October 14, 2003 R.B. requested that the respirator be disconnected, with the understanding that this would soon result in M.B.'s death. As required by the HCDA, the hospital notified various parties of the decision, including OMRDD and MHLS. The next day, MHLS filed a written notice of objection, which resulted in suspension of R.B.'s order to discontinue life-sustaining treatment.

Uncertain of how to proceed, R.B. and his sister appeared pro se in Richmond County Surrogate's Court on October 17, 2003,

asking the Surrogate to authorize the hospital to honor R.B.'s request, but the matter was adjourned so that MHLS could initiate formal proceedings. By order to show cause and petition dated October 20, 2003, MHLS sought a declaration that R.B. lacked the authority to issue an order ending life-sustaining treatment because he was appointed guardian two months before the effective date of the HCDA. Having retained private counsel, R.B. opposed the objection. The New York Attorney General's office appeared on behalf of the Staten Island Developmental Disabilities Services Office (SIDDSO), a regional division of OMRDD.[2] Initially taking no position on the controversy, SIDDSO ultimately supported R.B.'s position.

At a proceeding three days later, MHLS asserted that it agreed with R.B.'s conclusion that the cessation of life-sustaining treatment would be in the best interests of M.B. and that it was satisfied that the guardian had complied with all of the procedural and substantive safeguards required under the HCDA. MHLS explained that its objection was not predicated on the facts of this particular case, but on its interpretation that the HCDA did not empower guardians appointed prior to March 16, 2003 to make decisions involving the cessation of life-sustaining treatment for mentally retarded persons. Rather, MHLS argued that these previously-appointed guardians could not exercise such authority unless they individually petitioned Surrogate's Court for an expansion of their guardianship power. As for the current dilemma facing M.B.'s guardian, MHLS contended that the proceeding could be converted into a guardianship expansion proceeding so that R.B. could be granted the authority to render end-of-life decisions for his brother.

R.B.'s attorney countered that it was evident from the plain language and history of the HCDA that the Legislature had intended to extend to all guardians, regardless of the date of appointment, the power to request the termination of life-sustaining treatment under the new procedures set forth in SCPA 1750-b. R.B. reasoned that, had the Legislature intended to require previously-appointed guardians to petition for new

2. SIDDSO is a division of the state Office of Mental Retardation and Developmental Disabilities. OMRDD operates 14 regional DDSOs in New York State, which coordinate and deliver services to mentally retarded and developmentally disabled individuals (and their families) whether they reside in state-operated facilities, group homes or family settings (OMRDD Information for Individuals and Families <http://www.omr.state.ny.us/hp_individuals.jsp> [last updated Feb. 14, 2006], cached at <http://www.courts.state.ny.us/reporter/webdocs/NYS-OMRDD_Families.htm>).

powers, it would surely have said so, rather than including language in the HCDA suggesting precisely the opposite.

Surrogate's Court rejected MHLS' objection, concluding that R.B. was empowered under the HCDA to order the cessation of life-sustaining treatment for his brother, even though R.B.'s guardianship order was issued before the effective date of the Act. Pursuant to the Surrogate's order, M.B. was removed from the respirator and died within hours.

Acknowledging that M.B.'s death mooted its objection, MHLS nonetheless pursued an appeal, contending that the case fell within the exception to the mootness doctrine as it was capable of repetition, likely to evade review and involved a substantial legal issue. Considering the appeal under the mootness exception, the Appellate Division reversed and granted MHLS' petition. Focusing on the legislative history of the HCDA, a majority of the Court held that the Legislature had not intended to extend to existing guardians the end-of-life decision-making powers now recognized in the HCDA. The majority was concerned that mentally retarded persons with guardians appointed prior to the effective date of the new legislation lacked an opportunity to have their capacity to make health care decisions specifically considered. If the legislation was interpreted to apply to all guardians, the majority believed that mentally retarded individuals who might be able to make such decisions for themselves would not be adequately protected. The Court therefore concluded that previously-appointed guardians must petition for enlargement of guardianship authority so that the capacity issue could be directly explored for each mentally retarded person. The dissent would have affirmed the order denying the objection, reasoning that the plain language of the HCDA indicated a legislative intent to authorize existing guardians to make all necessary health care decisions, including end-of-life decisions. The Appellate Division granted SIDDSO leave to appeal to this Court.[3]

After the Appellate Division ruling, both houses of the Legislature passed bills that, if enacted, would have altered the guardianship enlargement procedure envisioned by the Appellate Division majority (2005 NY Senate Bill S 5803; 2005 NY Assembly Bill A 8906). Both the Senate and Assembly sponsors of the new legislation stated that the legislative intent of the

---

3. In granting leave, the Appellate Division certified the question: "Was the opinion and order of this court dated June 13, 2005, properly made?"

HCDA had been to retroactively confer full health care decision-making authority on the tens of thousands of existing guardians without a requirement that they seek new guardianship orders from the courts (Mem in Support of Senator Hannon, Bill S 5803; Mem in Support of Assembly Member P. Rivera, Bill A 8906). Although he agreed with the sponsors' view of the scope of the HCDA, the Governor vetoed the legislation, concluding that the proposed amendment was premature in light of the pending appeal to this Court (Governor Pataki Veto Message No. 121 of 2005).

## Analysis

Like the Appellate Division, we address this appeal under the exception to the mootness doctrine because the issue presented is substantial, likely to recur and involves a situation capable of evading review (*Matter of Hearst Corp. v Clyne*, 50 NY2d 707 [1980]). Both SIDDSO and MHLS emphasize that this case presents an issue of statutory interpretation. MHLS did not contend below and does not assert here that there is any constitutional impediment to interpreting the legislation in the manner urged by SIDDSO. As such, our task—as it is in every case involving statutory interpretation—is to ascertain the legislative intent and construe the pertinent statutes to effectuate that intent.

We begin with the statutory text, which is the clearest indicator of legislative purpose (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). If the "language . . . is clear and unambiguous, courts must give effect to its plain meaning" (*State of New York v Patricia II.*, 6 NY3d 160, 162 [2006], quoting *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington*, 97 NY2d 86, 91 [2001]). When the terms of related statutes are involved, as is the case here, they must be analyzed in context and in a manner that "harmonize[s] the related provisions . . . [and] renders them compatible" (*Tall Trees*, 97 NY2d at 91).

In this case, SIDDSO relies on two provisions of the HCDA as evidence that the Legislature intended to grant existing guardians the right to make end-of-life decisions. First, SIDDSO points to the new subdivision added to SCPA 1750. After directing that guardianship proceedings include a certification by medical personnel concerning the mentally retarded person's capacity to make health care decisions, the Legislature provided: "The absence of this determination in the case of guardians ap-

pointed prior to the effective date of this subdivision shall not preclude such guardians from making health care decisions" (SCPA 1750 [2]). The Legislature thus explicitly exempted existing guardians from the new requirement that guardianship proceedings specifically address the mentally retarded person's capacity to make health care decisions.

Second, SIDDSO cites the language in the first subdivision of the new SCPA 1750-b, entitled "Scope of authority," which provides:

> *"Unless specifically prohibited by the court after consideration of the determination, if any, regarding a mentally retarded person's capacity to make health care decisions,* which is required by section [1750] of this article, *the guardian of such person appointed pursuant to section [1750] of this article shall have the authority to make any and all health care decisions, as defined by [Public Health Law § 2980 (6)], on behalf of the mentally retarded person that such person could make if such person had capacity.* Such decisions may include decisions to withhold or withdraw life-sustaining treatment, as defined in [Mental Hygiene Law § 81.29 (e)]. The provisions of this article are not intended to permit or promote suicide, assisted suicide or euthanasia; accordingly, nothing in this section shall be construed to permit a guardian to consent to any act or omission to which the mentally retarded person[ ] could not consent if such person had capacity" (SCPA 1750-b [1] [emphasis added]).

We agree with SIDDSO that the phrasing of the first sentence of section 1750-b (1) is telling—not only in what it says but also in what it does not say. The Legislature did not declare that a guardian has authority to make medical decisions only if the court has expressly authorized the guardian to do so—language one would expect to find if the Legislature had intended to require existing guardians to petition for enlargement of their power as MHLS maintains. Instead, the Legislature has provided that all guardians *"have* the authority to make any and all health care decisions," "[u]nless specifically prohibited by the court" (SCPA 1750-b [1] [emphasis added]).

The phrase "if any" in the beginning of section 1750-b (1) further illuminates the legislative intent. Since guardians appointed after the effective date of the HCDA must include a cer-

tification concerning the mentally retarded person's health care decision-making capacity, this clause—which clarifies that health care decisions can be made even in the absence of such certification—can only be understood as referring to the authority of existing guardians who would not have obtained this certification. This interpretation of section 1750-b (1) is consistent with the clear statement in the newly-added section 1750 (2) exempting guardians appointed prior to the effective date of the HCDA from the specific health care decision-making competency certification requirement. Read together, sections 1750 (2) and 1750-b (1) reflect the intention of the Legislature to authorize guardians appointed prior to March 16, 2003 to make end-of-life decisions, provided those decisions are made pursuant to the exacting procedures specified in section 1750-b. The legislation does not indicate that existing guardians are to petition for new guardianship orders specifically expanding their health care decision-making authority.

The legislative history of the HCDA supports this construction. The Assembly sponsor stated that the purpose of the bill was to "allow the legally appointed guardians of mentally retarded individuals to have the authority to make medical decisions on behalf of such person, including decisions dealing with the withdrawal or withholding of life-sustaining treatment" (Mem in Support of Assembly Member Luster, 2002 NY Assembly Bill A 8466D [NY State Legis Retrieval Sys]). In his memorandum in support, the Senate sponsor repeatedly notes that the legislation was not viewed as a significant change in the law but was a clarification of the power the Legislature had always intended guardians of mentally retarded persons to possess under SCPA article 17-A. The sponsor stated: "This bill clarifies that guardians of persons with mental retardation have the authority to make health care decisions, including decisions regarding life-sustaining treatment under certain circumstances" (Mem of Senator Hannon in Support of NY Senate Bill S 4622B, 2002 NY Legis Ann, at 279). Echoing the language in the legislation, the Senate sponsor asserted that guardians "have the authority"—not that guardians must now seek to obtain health care decision-making authority. He described the purpose of the legislation as follows:

> "In general, the bill reflects four overarching motives: (1) to clarify that decisions regarding life-sustaining treatment are part of the natural contin-

uum of all health care decisions, (2) to allow decisions to end life-sustaining treatment only where the need is clearest . . . , (3) to utilize existing legal standards wherever possible, and (4) *to maintain judicial oversight of close decisions,* with a statutory structure incorporating a workable standard for the court" (*id.* at 280 [emphasis added]).

Thus, the role of the courts is described as "oversight of close decisions" relating to medical treatment, a clear reference to the objection process and resulting judicial proceeding referenced in section 1750-b (5) and (6).

The Commission on Quality of Care for the Mentally Disabled likewise observed that the bill would "clarify that guardians can make medical decisions on behalf of persons with mental retardation based upon the best interests and reasonably known wishes of the person[s] . . . including, when appropriate, withdrawal of life-sustaining treatment" (Letter from Commn on Quality of Care for Mentally Disabled to Counsel to Governor, Bill Jacket, L 2002, ch 500, at 10). Nowhere in the extensive Bill Jacket is there any suggestion that the Legislature intended previously-appointed guardians to have to initiate new court proceedings in order to acquire such authority. Such an interpretation would be inconsistent with the Legislature's repeatedly expressed view that it was clarifying the powers it vested in article 17-A guardians of mentally retarded persons, notwithstanding this Court's holding in *Storar.*

To be sure, the HCDA imposes a new obligation on guardians appointed after its effective date that was not—and is not—applicable to previously-appointed guardians. In addition to the long-standing requirement that medical personnel certify that the mentally retarded person is "incapable to manage him or herself and/or his or her affairs" (SCPA 1750 [1])—a certification all previously-appointed guardians would have filed—the HCDA now requires that prospective guardians also file a certification by medical personnel specifically addressing the mentally retarded person's capacity to make health care decisions (SCPA 1750 [2]). Previously-appointed guardians are expressly exempted from filing this health care capacity certification (SCPA 1750 [2]).

It does not follow—as MHLS argues—that the Act must be construed to require existing guardians to obtain new appointment orders because any other interpretation would be inconsistent with the Legislature's overriding concern that the rights

of mentally retarded persons, including those capable of making health care decisions, be protected. This argument turns on the assumption that the Legislature's decision to add a health care capacity certification requirement to the guardianship appointment procedure going forward indicated a belief that the former procedure was inadequate. This assumption is not supported by the statutory scheme or the pertinent legislative history. After all, each existing guardian was appointed based on a certification that the mentally retarded person was "incapable to manage him or herself and/or his or her affairs" (SCPA 1750 [1]). And the history shows that the Legislature did not view the prior appointment procedure as flawed—it merely sought to clarify the decision-making powers of future guardians.

Critically, the HCDA does not exempt previously-appointed guardians from any of the strict SCPA 1750-b procedures governing specific health care decision-making, including end-of-life decision-making. If a guardian seeks to withhold or withdraw life-sustaining treatment, the threshold step in the statutory decision-making structure is the requirement that the patient's attending physician, in consultation with at least one other medical professional, confirm that the patient lacks the capacity to make health care decisions (SCPA 1750-b [4] [a]). Because it requires two health care professionals to assess the mentally retarded person's capacity to make health care decisions, this requirement mimics the health care capacity certification undertaken in new guardianship proceedings. Thus, newly-appointed guardians will have to address the health care capacity issue twice (when initially appointed and again when making end-of-life decisions) while previously-appointed guardians will do so only when making a specific decision to end life-sustaining treatment. But the fact remains that the capacity of each mentally retarded person to make health care decisions will be explored before any decision by any guardian to end life-sustaining treatment is implemented, no matter when the guardian was appointed. In every meaningful respect, the authority of existing and newly-appointed guardians is exercised in an identical fashion under the HCDA because all guardians must comply with each step of the decision-making structure in SCPA 1750-b.

MHLS reads the first clause in the new section 1750-b (1)— "[u]nless specifically prohibited by the court"—as preserving the court's supervisory role over medical decision-making by guardians. This is true. Going forward, under the health care

capacity certification process applicable to guardians appointed after the effective date of the HCDA, courts must consider the mentally retarded person's capacity to make health care decisions and, in appropriate cases, may limit the guardian's authority in that realm. Moreover, courts are clearly empowered to resolve disputes concerning particular health care decisions made by guardians. But, by choosing to phrase the power granted guardians expansively—stating that they have health care decision-making authority unless the court specifically states otherwise—the Legislature recognized that guardians already possess that authority.

MHLS attempts to limit the import of the phrase "if any" in section 1750-b (1), arguing that it means only that existing guardians—who it claims must petition the court to expand their powers—are relieved from filing the specific health care capacity certification that new guardians must file under SCPA 1750 (2). But this interpretation undercuts the primary premise of MHLS' argument—that the Legislature could not have intended to authorize all guardians, even those appointed prior to the HCDA, to make health care decisions in the absence of certifications specifically addressing health care decision-making capacity. If, as MHLS suggests, the Legislature meant for existing guardians to apply for expansion of their power to specifically encompass health care decision-making, why did it expressly exempt them from the central requirement of that procedure by dispensing with the certification process through which the capacity of the mentally retarded person is determined?

In essence, MHLS suggests that SIDDSO's interpretation of the HCDA cannot be effectuated because this would result in distinctions between the obligations of existing and future guardians. However, MHLS relies on a construction that also treats previously-appointed guardians differently from new guardians since MHLS recognizes that SCPA 1750 (2) relieves the former from the health care decision-making capacity certification requirement. Since both parties proffer interpretations that result in differences between the two classes of guardians, the presence of such distinctions does not itself provide us with a basis to resolve the controversy.

The Legislature made a policy decision that newly-appointed guardians need to meet a specific health care capacity certification requirement. Given the thousands of previously-appointed guardians, state lawmakers chose not to impose the new capac-

ity certification requirement on existing guardians or otherwise require them to commence court proceedings seeking expansion of guardianship authority. In light of the significant procedural protections afforded in SCPA 1750-b, the Legislature concluded that the rights of mentally retarded persons would be safeguarded absent such a requirement.

MHLS is certainly correct that the HCDA provides for judicial oversight of end-of-life decisions by guardians. But, in the case of previously-appointed guardians, such judicial oversight occurs when a guardian reaches an end-of-life decision, the necessary parties are notified, and someone objects to the decision. The Legislature determined that it would serve no significant purpose to require each previously-appointed guardian to commence proceedings for the expansion of health care decision-making authority (which would have to occur even if no issue concerning end-of-life decision-making is pending or even likely to arise) given the procedural steps all guardians must follow under SCPA 1750-b, which includes an inquiry into the mentally retarded person's capacity to make health care decisions.

MHLS responds that this inquiry is not equivalent to the initial guardianship certification process contemplated under the new SCPA 1750 (2) because it occurs after the mentally retarded person is in medical crisis and therefore fails to adequately account for the possibility that the patient might once have had the capacity to make health care decisions. But whether judicial intervention is sought in the context of a guardianship expansion proceeding or a SCPA 1750-b objection, the court must render a determination based on the present capacity of the mentally retarded person—not abilities the patient may have once possessed. MHLS' contrary view of the statute would, in effect, prevent any existing guardian from obtaining the power to withdraw life-sustaining treatment if the patient was already in a terminal medical crisis when the HCDA became effective, excluding a class of patients—ironically, those in immediate need of the rights afforded by the legislation—from the protections of the HCDA, a result not intended by the Legislature.[4]

---

4. In this case, MHLS took the position that R.B. could apply for enlarged guardianship powers under SCPA 1750 (2), thereby obtaining authority to make medical decisions for M.B. and to withdraw life-sustaining treatment, even though M.B. was already in medical crisis, urging the court to pursue

Moreover, in circumstances where the mentally retarded person formerly had some capacity to make medical decisions, the guardian is nonetheless required to base medical decision-making "on the best interests of the mentally retarded person and, when reasonably known or ascertainable with reasonable diligence, on the mentally retarded person's wishes, including moral and religious beliefs" (SCPA 1750-b [2] [a]). Thus, the wishes of a mentally retarded individual who once had capacity to make health care decisions are not disregarded under the new statutory scheme.

In sum, while MHLS and the Appellate Division are understandably concerned that the interests of mentally retarded individuals be scrupulously protected, the Legislature designed the statutory scheme to meet that important objective. First, SCPA 1755 authorizes any person (including a mentally retarded person) at any time to seek judicial review of the scope of a guardianship order and "request[ ] modification of such order in order to protect the mentally retarded . . . person's . . . personal interests." In other words, even prior to the enactment of the HCDA, the authority granted a guardian with respect to a particular mentally retarded person was subject to judicial review in the event of a concern regarding the guardian's exercise of any aspect of that authority, including health care decision-making. The HCDA did not alter this procedure. As such, a mentally retarded individual who has health care decision-making capacity—or any party on his or her behalf, including MHLS—may petition the court for curtailment of the existing guardian's power in that arena.

Second, as this case demonstrates, the notification and objection process in SCPA 1750-b provides substantial protection to mentally retarded patients. Guardians must base health care decisions on the advice of qualified medical professionals and must follow a multistep procedure before any end-of-life decision will be honored by a health care facility. In any case where a disagreement arises between the guardian and one of a host of other interested parties (family members, the patient's medical caregivers, OMRDD, a residential director of a facility or MHLS), the statute mandates that the conflict be resolved by the courts. MHLS does not dispute the efficacy of this procedure, nor does it assail the Legislature's choice not to require

this procedural route rather than the objection procedure set forth in SCPA 1750-b (5) and (6).

judicial approval of health care decisions in circumstances where all parties agree that the guardian is acting in the mentally retarded individual's best interests. Although the Legislature could have charted a different course, the decision not to require previously-appointed guardians to seek new appointment orders was for the Legislature to make and, absent constitutional challenge, it must be upheld by this Court.

Accordingly, the order of the Appellate Division should be reversed, without costs, and the order of Surrogate's Court reinstated. The certified question should not be answered upon the ground that it is unnecessary.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, READ and R.S. SMITH concur.

Order reversed, etc.