[880 NYS2d 317]

In the Matter of WILLIAM C., Appellant. DEAN R. WEINSTOCK, Executive Director of Pilgrim Psychiatric Center, Respondent.

Second Department, May 26, 2009

**APPEARANCES OF COUNSEL**

*Mental Hygiene Legal Service*, Mineola (*Sidney Hirschfeld, Scott M. Wells* and *Dennis B. Feld* of counsel), for appellant.

*Andrew M. Cuomo, Attorney General*, New York City (*Michael S. Belohlavek, Monica Wagner* and *Richard Jackson* of counsel), for respondent.

OPINION OF THE COURT

BALKIN, J.

Enacted in 1999, Mental Hygiene Law § 9.60, commonly known as Kendra's Law,[1] provides a framework for the judicial authorization of involuntary outpatient treatment programs for persons suffering from mental illnesses. It requires those persons who have a history of medication noncompliance and decompensation to receive mental health services, or else face involuntary commitment. The issue of apparent first impression at the appellate level is whether Mental Hygiene Law § 9.60 authorizes the appointment of a money manager to assist with the financial affairs of a mentally ill person, who has not been declared incapacitated. Based on the language and history of Kendra's Law, we conclude that the statute so authorizes.

I.

The following facts essentially are undisputed. By order to show cause and petition dated July 20, 2007, the petitioner, Dean R. Weinstock, as Executive Director of Pilgrim Psychiatric Center (hereinafter the Hospital), a hospital licensed and operated by the New York State Office of Mental Health, commenced the instant proceeding in the Supreme Court, Suffolk County, seeking authorization for the imposition of an involuntary assisted outpatient treatment (hereinafter AOT) program pursuant to Mental Hygiene Law § 9.60 for William C. The accompanying petition alleged that William C., a 43 year old suffering from mental illness, was unlikely to survive safely in the community without supervision, had a history of lack of compliance with treatment for mental illness, and had been

---

1. Kendra's Law was introduced in response to public outcry following two similar incidents in the New York City subway system in 1999, when two men, diagnosed with schizophrenia, pushed two persons, one of whom was Kendra Webdale, into the path of oncoming subway trains (*see An Explanation of Kendra's Law*, http://www.omh.state.ny.us/omhweb/Kendra_web/Ksummary.htm; *Matter of K.L.*, 1 NY3d 362, 366 [2004]; *Matter of Manhattan Psychiatric Ctr.*, 285 AD2d 189, 191 [1st Dept 2001]; Blood, *Governor Pushes Kendra's Law, Seeks New Curbs on Violent Patients*, Daily News, May 19, 1999, at http://www.nydailynews.com/archives/news/1999/05/19/1999-05-19_gov_pushes_kendra_s_law__see.html). Both assailants had been recently discharged from psychiatric facilities, were noncompliant with psychiatric treatment, and lacked permanent housing (*id.*).

hospitalized at least twice within the preceding 36 months, before transfer to the Hospital.

The petition was supported by the affirmation of Dr. Soumitra Chatterjee, a psychiatrist who had medically evaluated William C. on July 12, 2007, as well as a prepared treatment plan worksheet pursuant to Mental Hygiene Law § 9.60 and a medication worksheet, outlining his treatment and prescribed medications. Dr. Chatterjee affirmed that William C. had been diagnosed with schizoaffective disorder, bipolar type—a severe and chronic mental illness as defined by Mental Hygiene Law § 1.03 (20)—spanning a psychiatric history of at least 20 hospitalizations for mental illness dating back to the 1980s. Dr. Chatterjee asserted that William C.'s noncompliance had "resulted in him losing his apartment, [and] becoming homeless." He further opined that William C. was unlikely to participate voluntarily with the treatment recommended for him, explaining that

> "[w]hen non-compliant with medication, [William C.] experiences rapid decompensation, becomes agitated, suspicious and paranoid that his apartment is infested with ticks and there is feces coming out of the faucets. He believes that people are invading his home and stealing from him. He becomes increasingly angry and violent, leading to physical assault of family members. He has extremely poor insight into his illness and is noncompliant with treatment, leading to multiple hospitalizations."

After consultation with William C. and his sister, Dr. Chatterjee recommended a treatment plan to serve his best interests, which included him living at a 24-hour supervised community residence, participation in socialization groups, psychiatric aftercare treatment, and care coordination by the Case Management Evaluation Referral and Assessment Unit of the Suffolk County Community Mental Hygiene Services. Additionally, the treatment plan recommended the appointment of the Federation of Organizations[2] to provide money management services on behalf of William C.

---

2. Under contract with the County of Suffolk, the Federation of Organizations is a not-for-profit, "community-based social welfare agency" operating several programs, including "representative payee services to individuals recovering from mental illnesses in Suffolk County who are unable to manage their own income" (http://www.fedoforg.org; *see Matter of Kanarskee,* 196 Misc 2d 469, 474 [2003]).

On July 25, 2007, the Supreme Court conducted a hearing on the petition, in which Dr. Chatterjee testified as to his evaluation and diagnosis of William C., his psychiatric and noncompliance history, his extensive medication requirements (including antipsychotics, mood stabilizers, anti-Parkinson's drugs and beta blockers), and his need for an AOT order. Dr. Chatterjee maintained that William C. was unlikely to voluntarily participate in the recommended AOT plan, which would greatly benefit him and prevent a relapse, and that money management services were required, given that William C. was unable or unwilling to pay his doctor bills and other bills, thereby resulting in his failure to receive medication and qualify for Medicaid. Dr. Chatterjee believed that the treatment plan was the least restrictive alternative available for William C.

According to a report by Lillian Graziano, LMSW, Intensive Case Manager, William C. "was always very responsible about paying the bills that, 'he saw' as important to pay," but if he believed that it was something that he was not supposed to pay, including rent, "he absolutely would not pay it." In fact, Ms. Graziano confirmed that the patient refused to pay the 20% Medicaid spend-down required by doctors' and clinics' bills for services rendered, so that he no longer received Medicaid but only Medicare.

Following the hearing, by order and judgment dated July 25, 2007, the Supreme Court, inter alia, determined that William C. met the criteria for an AOT order as set forth in Mental Hygiene Law § 9.60, and directed that he receive the AOT for a period of six months, including the money management services. The Supreme Court found that the evidence clearly indicated the need for such service, and that unless William C. participated in the AOT program, his welfare and ability to survive in the community would be jeopardized. This appeal ensued, limited to the propriety of the provision regarding money management.

William C. requested a rehearing and review of the proceedings pursuant to Mental Hygiene Law § 9.60 (m), which provides for a de novo rehearing and review of the AOT order and judgment by another Supreme Court Justice pursuant to Mental Hygiene Law § 9.35 (see Cohen v Anne C., 301 AD2d 446, 448 [2003]). By order dated October 30, 2007, the Supreme Court denied William C.'s application for, inter alia, a determination that the appointment of a money manager was improper.

## II.

Preliminarily, the Hospital contends that the appeal must be dismissed on the ground of mootness, given, inter alia, the expiration in January 2008 of the order and judgment appealed from and its unique nature peculiar to William C. In opposition, William C. argues that the issues presented fit within the exception to the mootness doctrine.[3]

The doctrine of mootness would ordinarily preclude a court from considering questions "which, although once live, have become moot by passage of time or change in circumstances. In general an appeal will be considered moot unless the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment" (*Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714 [1980]; *see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 810-811 [2003], *cert denied* 540 US 1017 [2003]). An exception to the mootness doctrine exists permitting courts to preserve for review important and recurring issues which, by virtue of their relatively brief existence, would be rendered otherwise nonreviewable (*see Matter of M.B.*, 6 NY3d 437, 447 [2006]; *Matter of Chenier v Richard W.*, 82 NY2d 830, 832 [1993]; *Matter of Manhattan Psychiatric Ctr.*, 285 AD2d 189, 191 [2001]).

■ Although the expiration of the order and judgment appealed from by its own terms renders this appeal moot, we find that the issue of whether Mental Hygiene Law § 9.60 authorizes the appointment of a money manager as a component of an AOT, squarely fits within the mootness exception (*see Matter of K.L.*, 302 AD2d 388, 389, *affd* 1 NY3d 362 [2004]; *Matter of Manhattan Psychiatric Ctr.*, 285 AD2d 189, 191 [2001]). This issue has a likelihood of repetition vis-à-vis mentally ill persons and mental health facilities and, in fact, at least two trial courts have already faced the issue, reaching different results (*see Matter of MacGilvary v Thomas I.*, 22 Misc 3d 1121[A], 2008 NY Slip Op 52655[U] [Suffolk County Ct 2008] [disallowing money manager]; *Matter of Kanarskee*, 196 Misc 2d 469, 476 [Sup Ct, Suffolk County 2003] [authorizing money manager]). The issue will typically evade appellate review due to the short six-month term of the AOT plans (*see* Mental Hygiene Law § 9.60 [j] [2];

---

**3.** By decision and order on motion dated July 9, 2008 (2008 NY Slip Op 77239[U] [2008]), this Court denied that branch of the motion which was to expand the record and referred the issue of dismissal of the appeal to this panel.

*Mental Hygiene Legal Servs. v Ford,* 92 NY2d 500, 505-506 [1998]; *Matter of Hearst Corp. v Clyne,* 50 NY2d at 714-715; *cf. Cohen v Anne C.,* 301 AD2d at 448). Just as important, it implicates significant and novel questions of statewide importance (*see Matter of Chenier v Richard W.,* 82 NY2d at 832; *Matter of Westchester Rockland Newspapers v Leggett,* 48 NY2d 430 [1979]), involving the rights of patients suffering from mental illnesses. For these reasons, we reject the Hospital's mootness argument, and turn to the merits of the appeal.

## III.

█ William C. posits that the Supreme Court erred in authorizing money management services within the AOT plan, as Mental Hygiene Law § 9.60 only contemplates outpatient medical services necessary to assist patients in living and functioning in the community, not "the micro-management of every aspect of their lives," including their finances. The Hospital counters that it is precisely because a money manager would assist patients' self-sufficiency in the community, that Mental Hygiene Law § 9.60 should be interpreted to permit such service. We agree with the Hospital's arguments.

"The starting point in any case of [statutory] interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577, 583 [1998]; *see Matter of Jansen Ct. Homeowners Assn. v City of New York,* 17 AD3d 588, 589 [2005]). "When the terms of related statutes are involved, as is the case here, they must be analyzed in context and in a manner that 'harmonize[s] the related provisions . . . [and] renders them compatible' " (*Matter of M.B.,* 6 NY3d at 447, citing *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86, 91 [2001]).

Having previously been found to pass constitutional muster (*see Matter of K.L.,* 1 NY3d at 366; *Matter of Weinstock,* 288 AD2d 480 [2001]), Mental Hygiene Law § 9.60 (a) (1)[4] defines an AOT plan, in relevant part, as follows:

> " 'assisted outpatient treatment' shall mean categories of outpatient services which have been ordered by the court pursuant to this section. Such treatment shall include case management services or as-

---

4. In 2005, Kendra's Law was amended and extended for five years until June 30, 2010 (L 2005, ch 158, § 9).

sertive community treatment team services to provide care coordination, and may also include any of the following categories of services: medication; periodic blood tests or urinalysis to determine compliance with prescribed medications; individual or group therapy; day or partial day programming activities; educational and vocational training or activities; alcohol or substance abuse treatment and counseling and periodic tests for the presence of alcohol or illegal drugs for persons with a history of alcohol or substance abuse; supervision of living arrangements; and any other services within a local or unified services plan developed pursuant to article forty-one of this chapter, prescribed to treat the person's mental illness and to assist the person in living and functioning in the community, or to attempt to prevent a relapse or deterioration that may reasonably be predicted to result in suicide or the need for hospitalization."

Prior to judicial authorization of an AOT for an adult, Mental Hygiene Law § 9.60 (c) enumerates several requirements to be established, including that the patient "is suffering from a mental illness," "is unlikely to survive safely in the community without supervision," has a treatment noncompliance history necessitating hospitalization or resulting in "serious violent behavior" or threats toward self or others, is presently "unlikely to voluntarily participate in outpatient treatment," and is in "need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to the [patient] or others" (Mental Hygiene Law § 9.60 [c] [1]-[7]; see Matter of Manhattan Psychiatric Ctr., 285 AD2d at 193). This criteria must be established by "clear and convincing evidence" (Mental Hygiene Law § 9.60 [j] [3]; see Matter of K.L., 1 NY3d at 371; Matter of Weinstock, 288 AD2d at 481). As the New York State Legislature intended, this procedure recognizes that

"[s]ome mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis. Family members and caregivers often must stand by helplessly and watch their loved ones and patients decompensate. Effective mechanisms for accomplishing [care and treatment] include: the establishment

of assisted outpatient treatment as a mode of treatment; improved coordination of care for mentally ill persons living in the community; the expansion of the use of conditional release in psychiatric hospitals; and the improved dissemination of information between and among mental health providers and general hospital emergency rooms." (L 1999, ch 408, § 2, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 9.60, Historical and Statutory Notes, at 240.)

Applying these principles to the matter at bar, the Supreme Court providently ordered money management services as a component of the AOT order. It is undisputed that the Hospital met its burden of establishing that William C. was a person in need of an AOT order because of his noncompliance and hospitalization history (*see* Mental Hygiene Law § 9.60 [c]). Indeed, William C. does not challenge the Supreme Court's underlying finding that he cannot be left to his own devices and requires outpatient assistance to return to the community at large (*see Matter of Manhattan Psychiatric Ctr.*, 285 AD2d at 196). His only contentions concern the propriety of the AOT's money management services component, and whether that was a "feasible less restrictive alternative" (Mental Hygiene Law § 9.60 [j] [2]).

Although Mental Hygiene Law § 9.60 does not specifically refer to money management services, it permits the provision of "assisted outpatient treatment" including "any other services within a local or unified services plan . . . prescribed to treat the person's mental illness and to assist the person in living and functioning in the community" (Mental Hygiene Law § 9.60 [a] [1]). It cannot be seriously disputed that money management is a service which would assist a mentally ill person in "living and functioning" as a productive member of the community. Particularly with respect to William C., there was clear and convincing documentary and testimonial evidence of his failure to properly manage his money by continuously refusing to pay for certain medical services, thereby jeopardizing his eligibility for Medicaid and thus access to his medications.

Unless his medications are to be provided through either Medicare or Medicaid, it would appear virtually certain not only that William C. would fail to medicate, but also that he would rapidly decompensate, as indicated by the expert testimony (*see Matter of Weinstock*, 288 AD2d at 481; *Matter of Barry H.*, 189

Misc 2d 446, 450 [2001]). This scenario, viewed in light of proof elicited at the hearing that William C. would likely fall behind on his rent and housing payments, more than justifies the conclusion that money management services are appropriate. Such services, more than merely appropriate, are essential to prevent a relapse of William C. and to prevent his consequently becoming a danger to himself or others (*see Matter of Weinstock*, 288 AD2d at 481; *Matter of Manhattan Psychiatric Ctr.*, 285 AD2d at 196). As such, we find that Mental Hygiene Law § 9.60 permits the inclusion of money management services as part of William C.'s AOT order.

Further support for the appointment of a money manager can be found in the legislative goals of the statute. "[L]egislative intent is the great and controlling principle, and the proper judicial function is to discern and apply the will of the [legislators]" (*Matter of ATM One v Landaverde*, 2 NY3d 472, 476-477 [2004]; *see Matter of Sutka v Conners*, 73 NY2d 395, 403 [1989]; *East Acupuncture, P.C. v Allstate Ins. Co.*, 61 AD3d 202 [2009]). In enacting Kendra's Law, the Legislature found that certain mentally ill persons would function "well and safely in the community with supervision and treatment, but who without such assistance, will relapse and require long periods of hospitalization" (L 1999, ch 408, § 2, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 9.60, Historical and Statutory Notes, at 240; *see Matter of Manhattan Psychiatric Ctr.*, 285 AD2d at 196).

Consonant with this legislative intent, by providing a money manager for William C., the AOT would go a long way in ensuring his continuous treatment and his housing stability, two of the main correlators in the prevention of violent acts by mentally ill persons, as found by the Legislature (*see* L 1999, ch 408, § 2; *Matter of Manhattan Psychiatric Ctr.*, 285 AD2d at 196; *Matter of Barry H.*, 189 Misc 2d 446, 452 [2001]). It would additionally advance the strong "state's interest in immediately removing from the streets noncompliant patients previously found to be, as a result of their noncompliance, at risk of a relapse or deterioration likely to result in serious harm to themselves or others" (*Matter of K.L.*, 1 NY3d at 373).

Further, as stated in Mental Hygiene Law § 9.60 (a), money management services fit within the comprehensive goals of Mental Hygiene Law article 41, which is designed: "to enable and encourage local governments to develop in the community preventive, rehabilitative, and treatment services offering conti-

nuity of care; to improve and to expand existing community programs for the mentally ill." (Mental Hygiene Law § 41.01.) In meeting this goal, Mental Hygiene Law § 41.03 (15) authorizes a municipality to provide "programs and related administrative activities designed to enhance the community living skills and prevent the unnecessary hospitalization of the seriously impaired, chronically mentally ill population." Mental Hygiene Law § 41.21 (f) further provides for unified services, including:

"(1) In patient services.

"(2) Out-patient services. . . .

"(6) Preventive services.

"(7) Diagnostic and referral services. . . .

"(13) Such other services as may be approved by the commissioner."

Money management services would easily fall within the broad scope of article 41 because they would assist mentally ill patients in ensuring for them a "continuity of care" (Mental Hygiene Law § 41.01) and other benefits, including uninterrupted psychiatric services and medications, essential components to treat mental conditions and prevent relapse (Mental Hygiene Law § 41.01). Money management services, thus, fit rationally and reasonably within "community preventive, rehabilitative, and treatment services" (id.).

In sum, as noted by the court in Matter of Kanarskee (196 Misc 2d at 474) and it is equally true here, both Mental Hygiene Law § 9.60 and article 41 permit the appointment of a money manager, subject to an independent review by the Social Security Administration as to the designation of an appropriate "representative payee" to manage the patient's Social Security benefits (see 42 USC § 1383 [a]; § 405 [j]; Matter of Kanarskee, 196 Misc 2d at 476-477).

## IV.

■ William C. alternatively contends that the appointment of his sister as the money manager would have constituted a less restrictive alternative when compared to the court's appointment of the Federation of Organizations. Although the Supreme Court is required to explore possible "feasible less restrictive alternative" treatments that might be appropriate for the patient's diagnosis (Mental Hygiene Law § 9.60 [j] [2]), William

C.'s contention in this respect is unsupported by the record. The record reveals that the appointment of the Federation of Organizations represented the "less restrictive alternative" available to William C. Other than the fact that William C. had a sister, there was nothing in the record demonstrating that she was a viable alternative or even desirous of taking full responsibility for the care of her brother.

 Finally, William C. asserts that a guardianship proceeding pursuant to Mental Hygiene Law article 81 would have been the only appropriate mechanism for the appointment of a money manager for him. The Hospital disputes the notion that article 81 is the exclusive remedy for money management services or that it would be applicable to William C.'s circumstances, given that he has not been rendered incapacitated by his mental illness. We agree with the Hospital.

Article 81 of the Mental Hygiene Law deals with guardianship proceedings involving the personal needs and/or property management of persons judicially declared incapacitated (see Mental Hygiene Law § 81.01 et seq.). Mental Hygiene Law § 81.02 requires a court to make a two-pronged determination: first that the appointment is "necessary to provide for the personal needs of that person, including food, clothing, shelter, health care, or safety and/or to manage the property and financial affairs of that person"; and second, "that the person agrees to the appointment, or that the person is incapacitated" (Mental Hygiene Law § 81.02 [a] [1], [2]; see Matter of Daniel TT., 39 AD3d 94, 97 [2007]; Matter of Maher, 207 AD2d 133, 139-140 [1994]).

Although William C. is correct that Mental Hygiene Law article 81 provides a procedure to declare a person incompetent and appoint a guardian to manage the person's affairs (see Mental Hygiene Law § 81.02 [a]), his reliance on that statute is misplaced. Aside from the fact that no one is seeking to declare William C. incapacitated, article 81 contemplates the divestiture of control over the incapacitated person's personal needs or/and financial affairs (see Matter of Joseph S., 25 AD3d 804, 805 [2006]), which is contrary to a money manager, who would work in tandem with the patient.

Moreover, the Court of Appeals in Matter of K.L. (1 NY3d at 372) specifically rejected a challenge to Mental Hygiene Law § 9.60 predicated upon the fact that the statutory scheme does not require a finding of incapacity prior to the approval of an AOT order (id.). Indeed, Mental Hygiene Law § 9.60 (o) specifi-

cally provides that the implementation of an AOT order "shall not be construed as or deemed to be a determination that such [patient] is incapacitated" under article 81. Contrary to William C.'s arguments, article 81 does not preempt the appointment of a money manager pursuant to Mental Hygiene Law § 9.60.

## V.

In accordance with the foregoing, we hold that Mental Hygiene Law § 9.60 authorizes the appointment of a money manager for a mentally ill person in connection with an AOT order. Accordingly, the order and judgment is affirmed insofar as appealed from.

MASTRO, J.P., FLORIO and ENG, JJ., concur.

Ordered that the order and judgment is affirmed insofar as appealed from, without costs or disbursements.

---

Motion by the respondent, inter alia, to dismiss an appeal from an order and judgment (one paper) of the Supreme Court, Suffolk County, dated July 25, 2007, on the ground that it has been rendered academic. By decision and order on motion of this Court dated July 9, 2008, the branch of the motion which was to dismiss the appeal was held in abeyance and referred to the panel of Justices hearing the appeal for determination upon the argument or submission thereof. Upon the papers filed in support of the motion, the papers filed in opposition thereto, and the argument of the appeal, it is Ordered that the branch of the motion which was to dismiss the appeal as academic is denied in light of our determination in *Matter of William C.* (decided herewith). MASTRO, J.P., FLORIO, BALKIN and ENG, JJ., concur.