[942 NE2d 225, 917 NYS2d 16]

In the Matter of the STATE OF NEW YORK, Appellant, v MUSTAFA RASHID, Respondent.

Argued October 19, 2010; decided November 23, 2010

**POINTS OF COUNSEL**

*Andrew M. Cuomo, Attorney General*, New York City (*Laura R. Johnson, Barbara D. Underwood* and *Benjamin N. Gutman* of counsel), for appellant. Mustafa Rashid is subject to Mental Hygiene Law article 10 under both the single-term rule and the related-offenses definition. (*People v Buss*, 11 NY3d 553; *People v Delk*, 59 AD3d 733, 12 NY3d 783; *People v Merejildo*, 45 AD3d 429; *People ex rel. Joseph II. v Superintendent of Southport Correctional Facility*, 15 NY3d 126.)

*Mental Hygiene Legal Service, First Judicial Department,* New York City (*Sadie Zea Ishee, Marvin Bernstein, Diane Goldstein Temkin* and *Karen Gomes Andresian* of counsel), for respondent. I. In 2008, Mustafa Rashid was on parole for robbery, not for a sex offense or a related offense. (*People ex rel. Joseph II. v Superintendent of Southport Correctional Facility,* 15 NY3d 126; *People v Maney,* 37 NY2d 229; *People v Zephrin,* 14 NY3d 296; *People v Francois,* 14 NY3d 732; *People v Buss,* 11 NY3d 553; *Matter of Dutchess County Dept. of Social Servs. v Day,* 96 NY2d 149; *Kansas v Hendricks,* 521 US 346; *Foucha v Louisiana,* 504 US 71; *People v Knox,* 12 NY3d 60; *Matter of Garner v New York State Dept. of Correctional Servs.,* 10 NY3d 358.) II. Mustafa Rashid was not subject to any form of State custody or supervision when these proceedings commenced, and therefore cannot be deemed a "detained sex offender." (*People ex rel. Joseph II. v Superintendent of Southport Correctional Facility,* 15 NY3d 126; *Telaro v Telaro,* 25 NY2d 433; *Quain v Buzzetta Constr. Corp.,* 69 NY2d 376; *People ex rel. David NN. v Hogan,* 53 AD3d 841; *Matter of Gershel v Porr,* 89 NY2d 327; *Mullane v Central Hanover Bank & Trust Co.,* 339 US 306; *Vitek v Jones,* 445 US 480; *Matter of State of New York v Millard,* 19 Misc 3d 283.)

**OPINION OF THE COURT**

READ, J.

In this appeal, we are called upon to resolve issues of interpretation of article 10 of the Mental Hygiene Law, the key component of the recently enacted Sex Offender Management and Treatment Act (SOMTA) (L 2007, ch 7). We hold that in order to pursue civil management under article 10, the Attorney General must file the required petition against an individual in a court of competent jurisdiction before that individual's release from State custody or supervision. We also hold that Penal Law § 70.30 is not relevant to the question of which sentences make someone eligible for civil management under article 10.

I

On January 6, 1992, respondent Mustafa Rashid pleaded guilty to two counts of first-degree robbery (Penal Law § 160.15), and single counts of first-degree burglary (Penal Law § 140.30), first-degree rape (Penal Law § 130.35), and first-degree sodomy (former Penal Law § 130.50). This plea satisfied charges arising from two separate criminal incidents—the robbery of a gas station attendant and a home invasion—for which

Rashid was arrested and indicted separately in 1988. He was sentenced to an indeterminate term of imprisonment of 8 to 16 years, running from his arrest.

Rashid was released to parole supervision in July 1999, after serving 11 years and eight months of his sentence. But on May 19, 2000, he was arrested and indicted separately for three robberies. On December 12, 2001, he pleaded guilty to two counts of third-degree robbery (Penal Law § 160.05), for each of which he was sentenced to an indeterminate term of 2 to 4 years, and one count of criminal possession of a weapon in the fourth degree (Penal Law § 265.01), for which he was sentenced to prison for one year. The indictment satisfied by Rashid's plea to the weapon-possession count also accused him of sexual abuse. These sentences ran concurrently to each other but consecutively to the undischarged portion of the indeterminate sentence imposed on Rashid in 1992 (*see* Penal Law § 70.25 [2-a]; *see also People ex rel. Gill v Greene*, 12 NY3d 1, 6 [2009]). He was subsequently released to parole supervision on January 6, 2006.

Rashid was returned to prison for violating the conditions of his parole in July 2006. He was released to parole supervision again in April 2007, but went back to prison after violating the conditions of his parole in August of that year. Rashid was next released to parole supervision in early 2008. He was arrested for the misdemeanor crimes of petit larceny (Penal Law § 155.25) and criminal possession of stolen property in the fifth degree (Penal Law § 165.40) on May 6, 2008. Upon pleading guilty to petit larceny, Rashid received a definite sentence, which he served at Rikers Island, a local correctional facility. Rashid remained subject to the supervision of the State Division of Parole (the Division) throughout his time at Rikers Island, but his parole was not revoked, apparently because his jail sentence ended days before his parole expiration date: Rashid was freed from Rikers Island on October 31, 2008, and his parole supervision ended on November 4, 2008, when he reached the maximum term (20 years) of his consecutive indeterminate sentences.

On November 5, 2008, the Attorney General filed a petition in Supreme Court seeking sex offender civil management of Rashid pursuant to article 10 of the Mental Hygiene Law. SOMTA and article 10 are designed to reduce the risks posed by and to address the treatment needs of those sex offenders who suffer from mental abnormalities that predispose them to commit repeated sex crimes (*see* Mental Hygiene Law §§ 10.01, 10.03 [i]). To these ends, whenever an individual "who may be a

detained sex offender" is "nearing an anticipated release"[1] into the community, an "agency with jurisdiction"[2] other than the Division must notify the Attorney General and the Commissioner of Mental Health (the Commissioner), while the Division may elect to do so (Mental Hygiene Law § 10.05 [b]). As relevant to this appeal, a "detained sex offender" is

> "a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either:

> "(1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section [10.03], and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; . . .

> "(4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article [10]." (Mental Hygiene Law § 10.03 [g] [1], [4].)

Again as relevant to this appeal, a "sex offense" includes felonies defined in article 130 of the Penal Law and any felony attempt or conspiracy to commit those crimes, as well as "a designated felony . . . if sexually motivated and committed prior to" article 10's effective date (Mental Hygiene Law § 10.03 [p]). The list of "designated felon[ies]" encompasses a broad range of felony crimes, including assault, gang assault, stalking, manslaughter, murder, kidnaping, burglary, arson, robbery, various prostitution and obscenity offenses, crimes involving sexual performance by a child, and any felony attempt or conspiracy to commit the enumerated crimes. "Related offenses" include "any offenses that are prosecuted as part of the same criminal action or proceeding, or which are part of the same criminal

---

1. "Release" and "released" mean "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention" (Mental Hygiene Law § 10.03 [m]).

2. An "[a]gency with jurisdiction" over a person means "that agency which, during the period in question, would be the agency responsible for supervising or releasing such person, and can include the department of correctional services, the office of mental health, the office for people with developmental disabilities, and the division of parole" (Mental Hygiene Law § 10.03 [a]).

transaction, or which are the bases of the orders of commitment received by the department of correctional services in connection with an inmate's current term of incarceration" (Mental Hygiene Law § 10.03 [*l*]).

Upon receipt of section 10.05 (b) notice, the Commissioner is authorized to "designate multidisciplinary staff" at the Office of Mental Health (OMH) to conduct "a preliminary review" of the need for "the person who is the subject of the notice" to be evaluated by a three-member "case review team," at least two of whose members must be "professionals in the field of mental health or the field of developmental disabilities, as appropriate, with experience in the treatment, diagnosis, risk assessment or management of sex offenders" (Mental Hygiene Law § 10.05 [a], [d]). If the staff decides after preliminary review to make a referral to a case review team, notice must be given to the individual whose case is to be referred (whom the statute identifies as "the respondent" at this point)[3] (Mental Hygiene Law § 10.05 [e]).

The case review team considers a variety of records, may arrange for a psychiatric examination, and ultimately determines whether the respondent is a "sex offender requiring civil management"—i.e., is both "detained" within the meaning of section 10.03 (g) and suffers from a "mental abnormality" as defined by section 10.03 (i)[4] (*see* Mental Hygiene Law § 10.03 [q]). If the case review team determines that the respondent is not a sex offender requiring civil management, it notifies the respondent and the Attorney General, who then "shall not file a sex offender civil management petition" (Mental Hygiene Law § 10.05 [f]). If, however, the case review team reaches the contrary conclusion, written notice is given to the respondent and the Attorney General, "accompanied by a written report from a psychiatric examiner that includes a finding as to whether the respondent has a mental abnormality" (Mental Hygiene Law § 10.05 [g]).

---

**3.** The statute defines "[r]espondent" as "a person referred to a case review team for evaluation, a person as to whom a sex offender civil management petition has been recommended by a case review team and not yet filed, or filed by the attorney general and not dismissed, or sustained by procedures under this article" (Mental Hygiene Law § 10.03 [n]).

**4.** "Mental abnormality" is defined as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03 [i]).

After receipt of section 10.05 (g) notice, the Attorney General may elect to file an article 10 petition against the respondent in the Supreme Court or County Court of the county where the respondent is located (Mental Hygiene Law § 10.06 [a]). Within 30 days after a petition is filed, Supreme Court or County Court must "conduct a hearing without a jury to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management" (Mental Hygiene Law § 10.06 [g]). If probable cause is established, the respondent may be confined, pending completion of a jury trial to be conducted within 60 days thereafter (Mental Hygiene Law § 10.06 [k]; § 10.07 [a]). The jury (or judge, if jury trial is waived) must then determine "by clear and convincing evidence whether the respondent is a detained sex offender who suffers from a mental abnormality" (Mental Hygiene Law § 10.07 [d]). The Attorney General bears the burden of proof, and any jury determination must be by unanimous verdict (*id.*).

If the jury (or judge, as the case may be) concludes that the respondent is a "detained sex offender who suffers from a mental abnormality," then the court must "consider whether the respondent is a dangerous sex offender requiring confinement *or* a sex offender requiring strict and intensive supervision" (Mental Hygiene Law § 10.07 [f] [emphasis added]). If the court "finds by clear and convincing evidence" that the respondent is afflicted with

> "a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that [he] is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement," who "shall be committed to a secure treatment facility for care, treatment, and control until such time as he or she no longer requires confinement" (*id.*).

Alternatively, if the judge "does not find that the respondent is a dangerous sex offender requiring confinement," the court "shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive

supervision and treatment" in accordance with article 10's provisions (*id.*).[5]

Here, the Division sent section 10.05 (b) notice to the Commissioner and the Attorney General on September 29, 2008, stating that Rashid had been "identified . . . as a person who is a detained sex offender . . . warrant[ing] notice to [OMH] of [impending] release"; and that he was under the Division's supervision until his sentence expired on November 4, 2008. On the attached case review worksheet, the Division specified that first-degree sodomy was the "qualifying sex offense or sexually motivated designated felony offense," and that Rashid exhibited a "pattern of sex offense."

On October 6, 2008, OMH gave section 10.05 (e) notice to Rashid; and on October 17, 2008, OMH issued section 10.05 (g) notice to Rashid and the Attorney General. The section 10.05 (g) notice set out two findings made by the case review team: that Rashid was "a sex offender requiring civil management as defined by SOMTA"; and—in contrast to the SOMTA-qualifying offense flagged in the referral from OMH (i.e., first-degree sodomy)—that Rashid's "sex offense was a designated felony that was sexually motivated."[6] As noted previously, Rashid was released from jail on October 31, 2008, his parole expired on November 4, 2008, and the Attorney General filed a sex offender civil management petition against him the next day, November 5, 2008.

Supreme Court directed that Rashid be confined pending the probable-cause hearing. Upon Rashid's motion, the court dismissed the first petition for improper service, but denied

---

**5.** The third annual report made by the Commissioner to the Governor and the Legislature pursuant to Mental Hygiene Law § 10.10 (i) (*see* http://www.omh.ny.gov/omhweb/statistics/SOMTA_Report.pdf) states that, during the 12-month reporting period from November 1, 2008 through October 31, 2009, OMH handled 1,798 referrals (involving 1,686 unique offenders) from agencies with jurisdiction. Of these 1,686 offenders, 194 (11.5%) were referred for evaluation by a case review team, of which 63 (3.7%) were recommended for civil management. Further, from April 13, 2007, when SOMTA took effect, to October 31, 2009, there have been 185 decisions regarding civil management. Mental abnormality was found in 171 (92.4%) of the trials, 99 of which resulted in a finding that the respondent is a dangerous sex offender requiring confinement, and 72 of which resulted in orders mandating strict and intensive supervision and treatment.

**6.** Section 10.05 (g) of the Mental Hygiene Law states that where the notice "indicates that a respondent stands convicted of or was charged with a designated felony, it shall also include the case review team's finding as to whether the act was sexually motivated."

Rashid's application for immediate release from custody in light of the Attorney General's representation that a second petition would be filed the same day.

At the probable-cause hearing held on November 19, 2008, the Attorney General argued that Rashid was a detained sex offender because he was subject to State custody or supervision for his 1992 convictions for rape and sodomy by operation of section 70.30 of the Penal Law. The Attorney General also suggested, in the alternative, that Rashid's SOMTA-qualifying offense was a sexually motivated designated felony because "even though [Rashid] only pled to a misdemeanor [i.e., his plea in 2001 to weapon possession] the misdemeanor was . . . on the indictment with the sexually motivated robbery as well." When the judge asked the Attorney General "When did you begin the Article 10?" he responded, "on October 6, 2008, we served notice to the respondent pursuant to 10.05 of the Mental Hygiene Law." The Attorney General immediately added that he was referring to section 10.05 (e).

The judge concluded that Rashid was a detained sex offender. He explained that

> "[i]n doing so the Court relies on Article 70.00 of the Penal Law, which relates to consecutive sentences . . .

> "Under Article 70.00 [the 1992 and 2001] sentences combined so that the minimum and maximum instead of being 8 to 16 is 10 to 20. And that *if this proceeding was commenced prior to the expiration of the 20 years during which time [Rashid] was still incarcerated*, accordingly under the definition of a detained sex offender, [he] is a detained sex offender" (emphasis added).

Additionally, the judge concluded that Rashid suffered from a mental abnormality, relying on the testimony of the State's expert, a licensed psychologist and psychiatric examiner for OMH.

Accordingly, the court determined that there was probable cause to believe that Rashid was a sex offender requiring civil management. Because of Rashid's "long history of criminality going back to his youth," the court further determined that there was probable cause to believe that Rashid was dangerous enough to require confinement pending trial, and that lesser conditions of confinement were insufficient to protect the public

since his behavior while incarcerated was "exemplary," but once released he reverted to substance abuse and violent crime (*see Mental Hygiene Legal Serv. v Spitzer*, 2007 WL 4115936, 2007 US Dist LEXIS 85163 [SD NY 2007], *affd sub nom. Mental Hygiene Legal Servs. v Paterson*, 2009 WL 579445, 2009 US App LEXIS 4492 [2d Cir 2009] [imposing preliminary injunction requiring specific, individualized judicial finding with respect to portion of Mental Hygiene Law § 10.06 (k) addressing pretrial detention]). The judge ordered Rashid to be committed to a secure treatment facility pending completion of trial, which he scheduled. The case was then adjourned to another judge to handle further proceedings.

Rashid next moved to dismiss the petition on several grounds, including that his conviction for a weapon-possession misdemeanor was not a sexually motivated designated felony. On June 5, 2009, the judge granted Rashid's motion because, as he subsequently explained, Rashid's "conviction for criminal possession of a weapon in the fourth degree (a class A misdemeanor) does not qualify as a 'designated felony' under the statute" and "[t]he only allegations in the second petition which asserted that [Rashid] was a detained sex offender arose from this misdemeanor conviction" (*see* 25 Misc 3d 318, 326 [Sup Ct, NY County 2009]).[7] The court granted the State leave to replead and file another petition, however.

The Attorney General then filed a third petition—the subject of this case—on June 10, 2009. This petition relied upon *People v Buss* (11 NY3d 553 [2008]) (handed down after the probable-cause hearing) and Penal Law § 70.30 to argue that Rashid was a "detained sex offender" because he was serving an aggregate maximum sentence that encompassed the 1992 convictions for rape and sodomy. Further, the Attorney General also asserted in the third petition that the relevant date to determine whether Rashid was a detained sex offender was September 29, 2008,

---

7. The probable-cause court was likewise not won over by the Attorney General's argument that Rashid was in State custody or under State supervision for a sexually motivated designated felony stemming from his 2001 convictions. In the motion court judge's view, the effect of his dismissal of the second petition and the State's subsequent filing of a third petition was therefore simply "to conform the pleadings in the petition to the allegations which both of the parties . . . had been assuming would constitute the basis for [Rashid's] trial" (25 Misc 3d at 327 n 9).

the date on which the Division gave section 10.05 (b) notice to the Commissioner and the Attorney General.[8]

Rashid moved to dismiss this petition on the ground that he was not a detained sex offender for two reasons: first, that at no relevant time was he serving a sentence or subject to parole or postrelease supervision for a "sex offense" or a "related offense," as those terms are defined in article 10; second, that article 10 requires a respondent to be a detained sex offender when the petition is filed. Supreme Court did not rule on the latter issue. Instead, for purposes of Rashid's motion to dismiss, the court assumed that the State's position was correct (25 Misc 3d at 330).

Turning to the first issue, the judge concluded that *Buss* did not govern which sentences, in addition to sex offenses, make an individual eligible for civil management because the Legislature "obviously inserted" the definition for "related offenses" into the statute for this very purpose (*id.* at 332). By contrast, SORA "provide[d] no clear answer regarding the sentence calculation question . . . addressed . . . in *Buss*," making application of the general rule in Penal Law § 70.30 reasonable (*id.* at 331).

Applying article 10's definitions for a "detained sex offender" and "related offenses" to the facts of this case, the judge observed that at the time Rashid received the section 10.05 (b) notice, he was in jail for petit larceny; he was not an inmate incarcerated under orders of commitment received by the Department of Correctional Services (DOCS). And while Rashid was still subject to parole supervision for his 2001 convictions, those convictions were not for sex offenses, or for crimes that were part of the same criminal transaction as a sex offense. The judge concluded that because Rashid was therefore not "currently serving a sentence for, or subject to supervision by the division of parole . . . for [a sex] offense or for a related offense" (Mental Hygiene Law § 10.03 [g] [1]), he was not a detained sex offender at the time alleged by the Attorney General to be relevant—i.e., September 29, 2008. Accordingly, Supreme Court granted Rashid's motion and dismissed the petition, declaring that Rashid was not a detained sex offender at

---

8. This was a shift of position. As already noted, the Attorney General represented at the probable-cause hearing that the relevant date was October 6, 2008, when OMH gave section 10.05 (e) notice to Rashid. The probable-cause court did not discuss the timeliness issue, but implicitly decided that the Attorney General had commenced a timely proceeding.

the time of either the interagency notice under section 10.05 (b) or the case review team notice under section 10.05 (e).

The Appellate Division affirmed. The court concluded that the different consequences of SORA registration and article 10 involuntary civil commitment, as well as the definition in article 10 of the "related offenses" to be considered in determining eligibility for civil commitment, "render[ed] Penal Law § 70.30 inapplicable for the purpose of merging the sentence for the rape into [Rashid's] subsequent sentence for the nonsexual offense" (68 AD3d 615, 616 [1st Dept 2009]). After granting the State permission to appeal (14 NY3d 711 [2010]), we denied Rashid's motion to vacate the stay of his release originally put in place by Supreme Court and continued by the Appellate Division, and granted him a calendar preference (15 NY3d 801 [2010]). We now affirm.

## II

We first consider whether an individual must be a detained sex offender on the date when the Attorney General files a sex offender civil management petition against him in order to remain subject to civil management under article 10. As a threshold matter, this issue is preserved for our review. Although not raised in the Appellate Division, Rashid contested timeliness on this basis in Supreme Court (see Matter of Seitelman v Lavine, 36 NY2d 165, 170 n 2 [1975] ["This court will consider a question that has been raised in the tribunal of original jurisdiction even though it may not have been argued in the Appellate Division"]; Telaro v Telaro, 25 NY2d 433, 437-438 [1969] [expressly rejecting argument that party "abandoned or waived" an argument by failing to raise it at the Appellate Division]).

Here, Rashid was not subject to State custody or supervision at the time the Attorney General filed any of the three petitions. But a petition must allege "that the respondent is a sex offender requiring civil management" (Mental Hygiene Law § 10.06 [a] [emphasis added]), which is defined as "a detained sex offender who suffers from a mental abnormality" (Mental Hygiene Law § 10.03 [q]). Moreover, as relevant to this appeal, a "detained sex offender" must be "in the care, custody, control, or supervision of an agency with jurisdiction" and, when on parole, "currently . . . subject to [the Division's] supervision . . . for [a sex] offense or for a related offense" (Mental Hygiene Law § 10.03 [g] [1] [emphasis added]; see also People ex rel. Joseph II. v Superintendent of Southport Correctional Facility,

15 NY3d 126, 135 [2010] [remarking that Legislature could have, but did not, extend article 10's coverage to sex offenders living unsupervised in the community]).

The Attorney General argues that the State may still pursue civil management in this case because Rashid, although not subject to parole supervision when the petitions were filed in Supreme Court, *was* a detained sex offender on September 29, 2008 when the Division gave interagency notice pursuant to section 10.05 (b). According to the Attorney General, the interagency notice marks the point in time "when this *proceeding* began" (emphasis added), even though Rashid was unaware of it. The State therefore asserts that filing the interagency notice somehow "locked in" or "froze" Rashid's status as "detained"— apparently for all time. As a result, it is unimportant that he was, in fact, *not* detained within the meaning of article 10 when the petition was filed.[9]

This novel interpretation finds no support in the statutory text. In the first place, the interagency notice required by section 10.05 (b) refers to "a person who *may be* a detained sex offender" (emphasis added), not someone who *is* a detained sex offender. All of the notices called for by section 10.05, titled "Notice and case review," simply denote milestones in an internal administrative review procedure that may—but usually does not (*see* n 5, *supra*)—result in a sex offender civil management petition. Thus, there is no actual "proceeding" against a respondent until the Attorney General elects to file a petition (*see* CPLR 304 [a] ["(a) special proceeding is commenced by filing a petition"]). In *Joseph II.*, we described the issue as "whether [respondents] were detained sex offenders *when the State began proceedings against them under article 10*" (15 NY3d at 132 [emphasis added]), clearly referring to "proceedings" commenced with the filing of a petition. If the Legislature had intended to enact something as counterintuitive as the

---

9. The dissent principally argues that a petition may be filed against someone who is not in State custody or subject to State supervision because "the Legislature expressed an unmistakable intent throughout article 10 not to impose rigid deadlines for taking action" (dissenting op at 27). While it is true that the failure to meet article 10's time lines does not defeat the subsequent filing of a petition, it does not follow that the Attorney General may seek the civil commitment of an individual over whom the criminal justice system no longer exerts authority. It also does not follow that, having timely commenced a proceeding by the filing of a petition, the subsequent trial has to be completed before that individual's underlying sentence expires (*see* dissenting op at 30).

State claims to have been the case—i.e., that an individual forever remains a detained sex offender subject to civil management under article 10 once "an agency with jurisdiction" notifies the Commissioner and the Attorney General that this individual "may be" a detained sex offender—it surely would have made its wishes explicit.

Lacking any conspicuous textual support for its position, the State asks us to make inferences from section 10.06 (h) and (f) of article 10. Section 10.06 (h) provides that

> "[i]f the respondent was released subsequent to notice under subdivision (b) of section 10.05 of this article, and is therefore at liberty when the petition is filed, the court shall order the respondent's return to confinement, observation, commitment, recommitment or retention, as applicable, for purposes of the probable cause hearing."

According to the State, this provision "underscores that the Legislature contemplated an offender's release prior to the filing of the petition"; and "[t]hus, it is unmistakably permissible to file a petition against a convicted sex offender who is at liberty."

The State's interpretation of section 10.06 (h) assumes, however, that "at liberty" means free from *both* State custody *and* State supervision. The statuses to which a respondent may be "return[ed]" from "liberty" under this provision are, however, all custodial in nature and typically followed by a period of State supervision. This suggests that section 10.06 (h) is meant to deal with the circumstance where a petition is filed against someone "at liberty" because not confined, but who is still subject to State supervision;[10] not a situation—such as we have here—where State supervision ended before the petition was filed. Section 10.06 (h) is not rendered "superfluous," as the dissent contends, just because it does not cover every conceivable "release" subsequent to section 10.05 (b) notice (*see* dissenting op at 29).

---

**10.** This seems to have been the fact pattern in *People ex rel. David NN. v Hogan* (53 AD3d 841 [3d Dept 2008]) and *Matter of State of New York v Millard* (19 Misc 3d 283 [Sup Ct, Broome County 2008]), the two lower court cases relied on by the State and cited by the dissent to argue that section 10.06 (h) "expressly contemplates that a petition can be filed after a respondent has completed a sentence" (dissenting op at 29). In both *David NN.* and *Millard,* the sex offenders, recently released from OMH custody, were subject to parole supervision when the Attorney General filed the article 10 petitions against them.

Section 10.06 (f) authorizes the Attorney General to file a "securing petition" to protect the public safety at any time after receipt of section 10.05 (b) notice in order to prevent a respondent's release "if it appears that the respondent may be released prior to the time the case review team makes a determination." If a securing petition is filed, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management"; and "[i]f the case review team determines that the respondent is not a sex offender requiring civil management, the attorney general shall so advise the court and the securing petition shall be dismissed." (*Id.*)

The State points out that a securing petition is discretionary; that "[t]he statute does not say that the failure to file a securing petition will terminate the article 10 process"; and that an individual held on a securing petition does not fall within the definition of a "detained sex offender" under Mental Hygiene Law § 10.03 (g). Again, the State simply assumes that this provision is directed at an individual whose parole has expired. The Legislature was far more likely to have been worried about someone scheduled to be released from State custody into the community who might threaten the public safety notwithstanding being subject to State supervision. And although there is nothing in the plain language of this provision to prevent the Attorney General from filing a securing petition to stop an individual's release from parole supervision, it does not follow that the Attorney General may subsequently file a sex offender civil management petition against an individual subject to a securing petition once that individual's parole expires.[11] As the State correctly noted, the definition of "detained sex offender" does not cover a person in custody pursuant to a securing petition filed pursuant to section 10.06 (f).

█ In sum, we read article 10 to require the Attorney General to file a sex offender civil management petition while a

---

**11.** The Mental Hygiene Legal Service contested the facial constitutionality of this provision in federal court on due process grounds. The District Court Judge, although acknowledging "serious and legitimate concerns about the potential operation of [section] 10.06 (f)," ultimately "decline[d] to issue a preliminary injunction against a provision that [might] rarely if ever be used, or if used, may be capable of being interpreted or applied [by New York courts] in a manner that does not offend the due process clause"; i.e., "[d]epending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue" (*Mental Hygiene Legal Serv.*, 2007 WL 4115936 at *11, 2007 US Dist LEXIS 85163 at *36-38).

respondent is in State custody or, if the respondent is not confined, still subject to State supervision. This interpretation is in keeping with the Legislature's intent to create a special set of procedures in article 10 to deal with the civil management of mentally ill sex offenders who are completing their prison terms. Article 10 was not designed to cover such individuals once they pass beyond the purview of the criminal justice system. At that point, the involuntary commitment provisions in article 9 of the Mental Hygiene Law might come into play in an appropriate case (see Mental Hygiene Law § 9.27 [a]).

## III

In *Buss*, the defendant pleaded guilty in 1983 to one count of first-degree sexual abuse and one count of second-degree assault, and was sentenced to concurrent indeterminate sentences of 2 to 6 years' imprisonment. While on parole in 1987, he attacked and stabbed an acquaintance. This time, Buss pleaded guilty to attempted murder in the second degree in full satisfaction of an indictment that included first-degree rape and first-degree sodomy counts. He was sentenced as a second violent felony offender to 10 to 20 years' imprisonment.

When Buss was released from prison in 2002, the Board of Examiners of Sex Offenders determined that he was required to register under SORA, citing the 1983 conviction for sexual abuse, and recommended that he be designated a level three sex offender. Buss objected, arguing that SORA did not apply to him because his sentence of sexual abuse "was due to expire" before SORA took effect in 1996 (11 NY3d at 556). The People countered that, by operation of Penal Law § 70.30 (1) (b), Buss was still serving a sentence for his 1983 conviction when SORA took effect. Section 70.30 (1) (b) provides that when two or more indeterminate sentences are consecutive, the minimum and maximum sentences are added to form aggregate minimum and maximum wholes, subject to certain limitations.

We agreed with the People, holding that "for SORA purposes a prisoner serving multiple sentences is subject to all sentences, whether concurrent or consecutive, that make up the merged or aggregate sentence he is serving. Buss was therefore still serving a sentence for his 1983 sex crime at the time SORA became effective in 1996" (11 NY3d at 557-558). We noted that "the primary function" of section 70.30 was "to allow for the ready calculation of parole eligibility," but considered it "reasonable" to consider this provision to decide "whether a prisoner who

has been given multiple sentences is subject to all his sentences for the duration of his term of imprisonment" for purposes of determining SORA eligibility (*id.* at 557).

Here, the State argues that, by virtue of Penal Law § 70.30 (1) (b) and our decision in *Buss*, Rashid was on parole for a SOMTA-qualifying offense until November 4, 2008 when his aggregate indeterminate sentence of 10 to 20 years expired. This is so, they contend, because that sentence encompassed not only his convictions for robbery in 2001, but also his convictions for rape and sodomy in 1992. By contrast, Rashid reasons that although it made sense for us to look to section 70.30 when trying to figure out an inmate's eligibility for SORA registration, we "did so in the absence of any statutory guidance within SORA itself as to the eligibility of persons serving multiple sentences"; and "[b]y contrast, Article 10 contains its own provision for determining which offenders subject to multiple sentences will be eligible for Article 10 civil commitment"; specifically, the definition for "[r]elated offenses." The motion court and the Appellate Division agreed with Rashid on this point, and so do we.

"Related offenses" include (1) offenses "prosecuted as part of the same criminal action or proceeding" as a sex offense as defined in article 10; (2) offenses "which are part of the same criminal transaction" as a sex offense as defined in article 10; and (3) offenses "which are the bases of the orders of commitment received by the department of correctional services in connection with an inmate's current term of incarceration" (Mental Hygiene Law § 10.03 [*l*]). Individuals subject to State custody or supervision on account of an offense within the first two categories of "[r]elated offenses" are eligible for civil management under article 10; the third category covers "inmates" serving their "current term[s] of incarceration" in DOCS's custody.[12]

Thus, the Legislature enacted in article 10 a comprehensive and complex scheme that defines which offenses "count" for

---

**12.** This third category of "[r]elated offenses" is broadly worded, reflecting the Legislature's apparent decision to give the State more leeway to pursue civil commitment against soon-to-be-released DOCS inmates than parolees (*see also* Mental Hygiene Law § 10.05 [b] [providing that an "agency with jurisdiction" *must* notify the Attorney General and the Commissioner of the impending release of a potential detained sex offender, while the Division *may* do so]). Thus, article 10 does not set out a "more favorable" eligibility rule for DOCS inmates about to be released on parole or postrelease supervision than Penal Law § 70.30 creates for purposes of assessing their SORA eligibility (*cf.* dissenting op at 34). A DOCS inmate does not even have to have been committed to DOCS's custody for a sex offense in order to be a "detained sex offender."

purposes of eligibility for civil management: sex offenses, sexually-motivated designated felonies committed prior to article 10's effective date, and those non-sex crimes that are related offenses. Superimposing Penal Law § 70.30 on article 10 for purposes of making eligibility determinations would distort this statutory scheme.

The State argues, in the alternative, that Rashid's 2001 robbery convictions qualify as "related offenses" because "at the time the article 10 process began, [his] 'current term of incarceration' was that [20]-year aggregate maximum term, in connection with which [DOCS] had received the commitment orders related to his robbery convictions as well as to his rape conviction." But Rashid was on parole and/or incarcerated at Rikers Island when "the article 10 process" was kicked off in the fall of 2008; the third prong of the definition of "related offenses" covers DOCS inmates, not a parolee or someone incarcerated for a misdemeanor in a local jail. In sum, when the Division notified the Commissioner and the Attorney General on September 29, 2008 that Rashid was an individual who might be a detained sex offender, he was not under the Division's supervision on account of conviction for a sex offense (his 2001 felony convictions were for robbery); or a sexually-motivated designated felony committed prior to article 10's effective date (the weapon-possession conviction was for a misdemeanor); or offenses which were prosecuted along with a sex offense or were part of the same criminal transaction as a sex offense; he was not an "inmate" serving his "current term of incarceration" for robbery in DOCS's custody because his parole was not revoked. Hence, Rashid did not "stand[ ] convicted" of a SOMTA-qualifying offense, and so was not a detained sex offender.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

GRAFFEO, J. (dissenting). In 1988, after respondent Mustafa Rashid was released from a Texas prison, he forcibly raped one woman and sodomized another during an armed invasion of a residence in New York. Released on parole in 1999, Rashid subsequently burglarized a woman's apartment, brandished a weapon, sexually assaulted the woman and her eight-month-old daughter, and then threatened to kill them. Rashid was reincarcerated and prior to the completion of his sentence, the State instituted civil commitment proceedings against him pursuant to article 10 of the Mental Hygiene Law because he was

considered a sex offender with an alleged mental abnormality that predisposed him to committing sexually violent crimes if released into the community. The State's evidence showed that Rashid denied having engaged in sexual assaults, refused to complete sex offender treatment while imprisoned, showed "significant traits" of being a psychopath and was at "high risk" of committing additional sex crimes. A mental health expert opined that Rashid's release from confinement "would be a serious danger to the community" and that nothing less than his commitment to a secure facility would be sufficient to ensure the safety of the public. Based on this proof, it is undisputed that there was probable cause to believe that Rashid was a subject for civil management.

Because the majority concludes that Rashid is not a sex offender within the meaning of article 10 and should be freed into society without restriction, I respectfully dissent.

I

Realizing that certain sexual predators pose a threat to public safety after their sentences expire, the Legislature has adopted extensive statutory procedures for the examination of certain individuals and, where declared to be mentally ill, such persons may be eligible for civil confinement beyond the termination of their supervision by the criminal justice system. The State originally utilized article 9 of the Mental Hygiene Law, which permits involuntary hospitalization of the mentally ill, but this Court held that incarcerated persons were to be processed under Correction Law § 402 because it was specifically directed toward mentally ill persons who were imprisoned (*see State of N.Y. ex rel. Harkavy v Consilvio*, 7 NY3d 607 [2006] [*Harkavy I*]).

Apparently concerned that section 402 was inadequate (*see People ex rel. Joseph II. v Superintendent of Southport Correctional Facility*, 15 NY3d 126, 132 [2010]), in 2007, the Legislature enacted the Sex Offender Management and Treatment Act as article 10 of the Mental Hygiene Law (L 2007, ch 7). The legislative impetus for the Act was a concern that some recidivistic sex offenders "have mental abnormalities that predispose them to engage in repeated sex offenses" and should be placed in "comprehensive programs of treatment and management" (Mental Hygiene Law § 10.01 [a], [b]). The mental abnormalities that qualify offenders for civil management are those that cause "serious difficulty in controlling" the urge to engage in sexually violent criminal conduct (*id.* § 10.03

[i]; *see id.* § 10.03 [q]). Article 10 provides that continued confinement beyond the expiration of a criminal sentence is restricted to the most dangerous sex offenders who have "such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (*id.* § 10.03 [e]). Sex offenders with mental abnormalities that do not rise to that level of dangerousness are treated instead with a program of "strict and intensive supervision" that does not involve confinement in a mental hygiene secure facility (*id.* § 10.03 [r]). In light of the restrictions on personal freedom that stem from an adjudication that a person is a sex offender requiring civil management, article 10 provides those individuals subject to review with specific procedural and substantive protections (*see e.g. id.* § 10.06 [b], [c], [e], [g]; § 10.07 [d], [e]; § 10.09).

The provisions of article 10 apply to any person who may be a "detained sex offender." As relevant to the case now before us, the definition of a "detained sex offender" includes "a person who is in the care, custody, control, or supervision of an agency with jurisdiction"—such as the Department of Correctional Services (DOCS), the Division of Parole or the Office of Mental Health (OMH)—and is "currently serving a sentence for, or subject to supervision by the division of parole" for a sex offense or a related offense (*id.* § 10.03 [g] [1]). Article 10 review begins when the agency with jurisdiction over a sex offender notifies the Attorney General and OMH that the individual is nearing "release" (*id.* § 10.05 [b]), i.e., the completion of incarceration, postrelease supervision (PRS) or parole (*see id.* § 10.03 [m]). OMH then reviews the person's records to determine whether the sex offender should be referred to a "case review team" for evaluation (*id.* § 10.05 [d]).

If the individual is referred to the review team, notice of the referral must be provided to the sex offender (*see id.* § 10.05 [e]) and that individual is then designated a "respondent" for the remainder of the proceedings (*see id.* § 10.03 [n]). The case review team assesses various records and materials to evaluate whether the respondent is a sex offender who suffers from a "mental abnormality" and is in need of civil management (*see id.* § 10.05 [e]). If found to require further management, article 10 directs the review team to notify the respondent and the Attorney General (*see id.* § 10.05 [g]). The Attorney General must then decide whether to file a civil management petition in court against the respondent (*see id.* § 10.06 [a]).

Once a petition is filed, counsel is appointed for the respondent and a court must find probable cause to believe that a sex offender is in need of civil management (*see id.* § 10.06 [c], [g]). In cases where probable cause exists, the respondent is entitled to have a jury unanimously determine whether the Attorney General has proved by clear and convincing evidence that the respondent is a sex offender with a mental abnormality (*see id.* § 10.07 [d]). Should the factfinder conclude that the State has met its burden, the court must then make its own determination as to whether the respondent should be confined in a secure facility or permitted to remain in the community under intensive supervision (*see id.* § 10.07 [f]).

## II

Respondent Mustafa Rashid was incarcerated in Texas in the 1980s following his second robbery conviction in that state. He was paroled in May 1988 and moved to New York. In October of that year, Rashid stole money during a knifepoint robbery of a gas station. On November 8th, he invaded a home while armed, stole property, forcibly raped a woman, sodomized another and stabbed a person who attempted to intercede. Rashid subsequently pleaded guilty to rape in the first degree, sodomy in the first degree, two counts of robbery in the first degree and robbery in the second degree. He was sentenced to an aggregate prison term of 8 to 16 years.

Rashid was paroled in July 1999. Less than a year later, he committed three different robberies during a five-day period. According to the indictments, the first robbery occurred when he entered a woman's home, indicated that he had a gun and threatened to shoot her if she did not give him money. The next day, Rashid approached a woman on an elevator, again pretended to have a gun and said that he would kill her unless she handed over money. After she replied that she had none, he went to the victim's apartment and told her husband that he had kidnapped her, knew she was pregnant and would kill her if the man did not give him cash.

The third robbery occurred when Rashid burglarized another woman's residence. He displayed an ice pick and threatened to kill the woman if she did not follow his orders. Rashid took the woman's eight-month-old daughter out of her arms, touched the baby's vagina, placed the ice pick to the woman's neck, fondled her breasts and masturbated until he ejaculated. While continuing to threaten the woman, he said, "If you don't give me money,

I will kill you and your baby." The woman gave Rashid some cash and he left. Rashid was arrested later that day.

As a result of these incidents, DOCS revoked Rashid's parole based on the 1988 home invasion and sex offenses. For these new crimes, he was indicted for robbery in the first degree, burglary, forcible sexual abuse, weapon possession and related offenses. Rashid subsequently pleaded guilty to two counts of robbery in the third degree and one count of criminal possession of a weapon in the fourth degree. An aggregate sentence of 2 to 4 years was imposed and was to run consecutively to the undischarged portion of the prior 8-to-16-year sentence that Rashid was still serving (see Penal Law § 70.25 [2-a]). Under Penal Law § 70.30 (1) (b), DOCS merged the two sentences into one, resulting in a combined sentence of 10 to 20 years that would not be completed until November 2008.

Rashid was paroled a second time in 2006, but parole supervision was revoked that July after Rashid was arrested for criminal possession of stolen property and larceny. He was given a third opportunity at parole, which he failed by using cocaine and not participating in drug treatment. After being paroled again in February 2008, a few months later Rashid was caught shoplifting and was charged with petit larceny. Since he pleaded guilty to that crime in return for a one-year sentence to be served at Rikers Island, and his sentence for the 1988 sex offenses and 2000 robberies was due to expire in November 2008, DOCS decided not to pursue revocation of his parole.

On September 29, 2008, the Division of Parole began an article 10 civil management review by notifying OMH that Rashid was a detained sex offender who was nearing the end of his sentence. On October 6th, OMH notified Rashid that his case had been referred to a review team to determine whether it would be recommended that he required civil management. Later that month, the case review team informed the Attorney General that it had concluded that Rashid required civil management.

Rashid was released from Rikers Island on October 31, 2008. His parole for the 1988 and 2000 offenses ended on November 4th. The Attorney General filed an article 10 petition in Supreme Court the next day. Because Rashid was at liberty, the court ordered his return to custody pursuant to Mental Hygiene Law § 10.06 (h) pending a hearing to determine whether there was probable cause to believe that Rashid was a sex offender requiring civil management.

At the probable cause hearing, a psychologist for the State testified about the evaluation of Rashid. He stated that Rashid had denied the sexual components of his crimes despite his prior guilty pleas and that he suffered from two psychological disorders that caused him to have trouble controlling his tendencies and behavior, and that a particular component of his personality disorder involved the acting out in a "sexually aggressive manner" when he was given the opportunity during the commission of nonsexual crimes. The psychologist also believed that Rashid showed "significant traits" of being a psychopath and that Rashid's poly-substance abuse contributed to his difficulty maintaining "independent impulse control" over his sexual predispositions while under the influence of narcotics.

The psychologist used an actuarial instrument called the Static-99 to assess Rashid's likelihood of committing another sex offense. He assigned Rashid a raw score of 7 out of 10, which placed him in "a high risk category for future sexual recidivism" that made him 46 times more likely than the average individual to commit a sex crime in the next five years and 66 times more likely over a 10-year span. The expert also noted that Rashid had never completed a sex offender treatment program. Based on all of these factors, the psychologist concluded that releasing Rashid without any restrictions "would be a serious danger to the community" and that he needed to be "in a secured treatment facility" pending the article 10 trial. Supreme Court found probable cause to believe that Rashid was a sex offender requiring civil management and therefore ordered that he be confined until trial.

In the petition underlying the trial, the State alleged that Rashid was a "detained sex offender" at the time the Mental Hygiene Law § 10.05 (b) notice was issued by the Division of Parole to OMH in September 2008. Although the maximum 16-year sentence for the 1988 sex offenses had been set to expire in 2004, the State maintained that because that sentence ran consecutively to the sentence for the 2000 offenses, and in accordance with *People v Buss* (11 NY3d 553 [2008]), the total aggregate sentence was 10 to 20 years. Consequently, the State asserted that the sentence for the sex offenses did not expire until November 2008 and, therefore, Rashid remained detained for a sex crime when the article 10 notice was issued regarding civil commitment review. The State alternatively contended that the 2000 offenses were "related offenses" that could serve as a

predicate for an article 10 petition because they were referenced in the DOCS commitment orders and those sentences related to the earlier sex crimes since the prison terms ran consecutively.

Prior to trial, Rashid moved to dismiss the petition, claiming that the reasoning of *Buss* did not apply to his case because it dealt with the requirements of the Sex Offender Registration Act (SORA) and, furthermore, his 2000 offenses were not "related offenses" since the commitment orders did not cite the sentence for the 1988 sex crimes. Rashid maintained that the petition was untimely. He asserted that even if *Buss* applied, he was not a "detained" sex offender when the State instituted the article 10 proceeding since his criminal sentence expired the day before the first petition had been filed.[1] As the majority notes, Supreme Court granted Rashid's motion and dismissed the petition (25 Misc 3d 318 [Sup Ct, NY County 2009]), and the Appellate Division affirmed (68 AD3d 615 [1st Dept 2009]).

### III

I am dissenting in this case because I agree with the State's contention that Rashid was a detained sex offender when the article 10 process commenced. The different actors in the article 10 process—the case review team, the Attorney General and the probable cause court—must all decide whether a person is a "sex offender requiring civil management" (Mental Hygiene Law § 10.05 [e]; § 10.06 [a], [k]), a phrase that requires the offender to be "detained" (*id.* § 10.03 [q]). As relevant to this appeal, a sex offender is defined as detained under the statute if the person "stands convicted of a sex offense" and is "currently serving" a sentence, PRS or parole for that offense or a related offense (*id.* § 10.03 [g] [1]). The threshold issue, and the basis of my disagreement with the majority and the courts below, is at what operative point must an offender be "currently serving" a sentence for a sex crime to qualify for civil management review.

Textually, the statutory language employs the present tense (*see id.*). The majority concludes that this requires the Attorney General to allege in an article 10 petition that the sex offender is serving a sentence and remains "detained" at the time the petition is filed. Certainly, the words used by the Legislature in a statutory enactment usually provide the initial basis for

---

1. Rashid's argument was directed at the third article 10 petition. The first petition was dismissed for improper service; the second was dismissed because it was erroneously premised on a misdemeanor offense.

analyzing its intended scope (*see e.g. Matter of M.B.*, 6 NY3d 437, 447 [2006]). The majority's interpretation is probably not untenable if the language is viewed in isolation. But there are instances when a strictly textual analysis of an isolated phrase cannot be harmonized with other parts of a comprehensive legislative scheme and would produce results that are so fundamentally inconsistent with the overarching purpose of the statute that it must yield to reasonableness and common sense in order to truly effectuate the Legislature's intent (*see e.g. Long v State of New York*, 7 NY3d 269, 273 [2006]; *People v Santi*, 3 NY3d 234, 242 [2004]).

This is one of those cases. The majority's holding that a petition must be filed before a sex offender completes a sentence cannot be reconciled with other provisions of the Act's text, its structure or its underlying legislative purpose. The majority's analysis will also give rise to a conundrum because a simplistic definitional analysis of "currently serving," carried to its logical conclusion, will render article 10 inapplicable in many cases that the Legislature intended to reach. Based on my reading of article 10 as a whole, I believe that the crucial juncture for determining whether an offender is "detained" and "currently serving" a sentence for a sex crime occurs at the time the offender is first notified that his case is being reviewed under article 10. I offer several reasons for this conclusion.

Nothing in the civil management act expressly imposes a strict time limitation on the Attorney General's ability to file a petition and commence the court proceeding. Rather, the Act establishes advisory time frames for each of the early stages in the article 10 process. The initial notice to OMH and the Attorney General is supposed to occur at least 120 days before a sex offender's anticipated release (*see* Mental Hygiene Law § 10.05 [b]). The case review team's notice of its determination is to be issued within 45 days after OMH was first notified (*see id.* § 10.05 [g]). If the Attorney General decides that a petition will be filed, it should be done within 30 days after receiving notice of the case review team's finding (*see id.* § 10.06 [a]). Each of these statutes emphasize that the failure to meet these time frames "shall not affect the validity of [any] notice *or any subsequent action, including the filing of a sex offender civil management petition*" by the Attorney General (*id.* § 10.05 [b] [emphasis added]; *see id.* § 10.05 [g]; § 10.06 [a]). Under the majority's rationale, the latter phrase is rendered superfluous and it ignores the catchall provision that emphasizes that the

"[t]ime periods specified" in article 10 "for actions by state agencies are goals that the agencies shall try to meet, but failure to act within such periods shall not invalidate later agency action except as explicitly provided by the provision in question" (*id.* § 10.08 [f]).

The majority overlooks three important factors in finding the petition here untimely. The most obvious is that the Legislature expressed an unmistakable intent throughout article 10 not to impose rigid deadlines for taking action, up to and including the filing of the petition. Second, the Attorney General is given 30 days to consider the OMH review team's finding before deciding whether to file a petition (*see id.* § 10.06 [a]). The Attorney General's office received Rashid's case on October 17, 2008 and made a decision on November 5th—less than 30 days later—yet it is being penalized by the majority for fulfilling its responsibility to properly review a case before deciding to proceed with a petition. Third, even if the petition had been filed more than 30 days after receipt of the referral, article 10 expressly provides that no sanction may be imposed, but that is effectively what the majority has done by dismissing the petition.

There was undoubtedly a practical reason for the Legislature to adopt advisory time guidelines rather than mandatory directives. It recognized that the number of cases and the time necessary to engage in adequate review would vary. For the 12-month period from November 2007 to the end of October 2008, OMH reviewed 1,581 sex offenders for possible civil management[2] and from November 2008 to the end of October 2009, the agency reviewed 1,798 cases.[3] From the large pool of cases reviewed between the enactment of article 10 through April 2010, OMH referred 383 cases to the Attorney General for civil management consideration.[4]

---

**2.** *See* New York State Office of Mental Health, 2008 Annual Report on the Implementation of Mental Hygiene Law Article 10, at 8, available at http://www.omh.state.ny.us/omhweb/resources/publications/2008_SOMTA_Report.pdf (accessed Oct. 29, 2010) (hereinafter 2008 OMH Report).

**3.** *See* New York State Office of Mental Health, 2009 Annual Report on the Implementation of Mental Hygiene Law Article 10, at 8, available at http://www.omh.state.ny.us/omhweb/statistics/SOMTA_Report.pdf (accessed Oct. 29, 2010) (hereinafter 2009 OMH Report).

**4.** *See* New York State Office of the Attorney General, A Report on the 2007 Law that Established Civil Management for Sex Offenders in New York

Although OMH is to make a determination 75 days before the anticipated release date of each offender (*see* Mental Hygiene Law § 10.05 [b], [g]), it's not unreasonable to expect that this extensive caseload has made compliance with that time frame difficult. On average, the Attorney General receives a referral from OMH only about 19 days before the respondent's release date (*see* 2009 OMH Report at 11; 2008 OMH Report at 7). In this case, consistent with that time frame, the Attorney General had a mere 18 days before Rashid was scheduled to finish his sentence. This not only made it difficult for the Attorney General to meet the goal of filing a petition within 45 days of Rashid's release (*see* Mental Hygiene Law § 10.06 [a]), it also increased the likelihood that the Attorney General would need additional time beyond Rashid's release date to investigate and reach an appropriate decision on whether to file an article 10 petition. Prior to today, the Attorney General had no reason to believe that there was a need to hastily file article 10 petitions to stop the clock from running out before it had an adequate opportunity to conduct thorough reviews of all the facts and circumstances of each offender's background when making critical determinations to seek civil commitments. After all, article 10 repeatedly advises that its time frames are advisory and that a failure to meet them will have no jurisdictional effect on the outcome of the proceedings.

The Legislature anticipated these difficulties and devised two safety-valve provisions to prevent a person who may be a dangerous sex offender from being immunized from article 10 review as a result of being released into the community. Section 10.06 (f) allows the Attorney General to file a securing petition if it appears that the offender may be released before the case review team can make its determination and where the Attorney General believes that public safety requires continued detention. This procedure was obviously not available to the Attorney General in this case since the OMH review team completed its assessment prior to the completion of Rashid's sentence.

Second, subdivision (h) of section 10.06 states that if a sex offender "was released" from custody after the initial section 10.05 (b) notice to OMH and "is therefore *at liberty when the petition is filed*," a court is required to order the person back into custody upon the filing of the petition for the purpose of a

State, at 11 (Apr. 13, 2010), available at http://www.ag.ny.gov/bureaus/sexual_offender/pdfs/April%202010%20Yearly%20Report.pdf (accessed Oct. 29, 2010) (hereinafter 2010 OAG Report).

probable cause hearing (*id.* § 10.06 [h] [emphasis added]). This statutory provision expressly contemplates that a petition can be filed after a respondent has completed a sentence (*see People ex rel. David NN. v Hogan*, 53 AD3d 841, 843 [3d Dept 2008], *lv denied* 11 NY3d 708 [2008]; *Matter of State of New York v Millard*, 19 Misc 3d 283, 287-288 [Sup Ct, Broome County 2008]). Contrary to the majority's suggestion, "release" is not just limited to the completion of a term of imprisonment—it also encompasses an individual who has completed a term of parole (*see* Mental Hygiene Law § 10.03 [m] [defining the term to include "discharge from confinement" or "from supervision by the division of parole"]).

That is what happened here. When Rashid completed parole on November 4, 2008, he was released within the meaning of section 10.03 (m) and was therefore "at liberty when the petition [wa]s filed" under section 10.06 (h). Consequently, the Attorney General permissibly sought Rashid's return to confinement and Supreme Court granted that relief. Although the majority reasons that section 10.06 (h) only applies to individuals who remain on parole when the petition is filed (*see* majority op at 15), this conflicts with the fact that being "at liberty" can arise from a discharge from parole (*see* Mental Hygiene Law § 10.06 [h] ["the respondent was released . . . and is therefore at liberty"]) and that a release based on the expiration of a term of parole is treated the same as release from incarceration—in both situations, the Act provides a means for returning the person to State custody. Thus, the majority's holding that a petition cannot be filed after a sex offender is released (despite receiving notice while serving the sentence) unequivocally contradicts the language of sections 10.03 (m) and 10.06 (h) and disregards the rule that courts should not read legislative enactments in a manner that causes them to become superfluous (*see e.g. Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367, 373 [2007]).

The majority's belief that "at liberty" refers only to individuals who are on parole when the petition is filed is further at odds with one of the important reasons the Legislature enacted article 10—to reach the most serious sex offenders who are so dangerous that they cannot be conditionally released during the term of their sentences and therefore remain incarcerated for the entire duration of their sentences. Under the majority's reading of section 10.06 (h), the commencement of an article 10 process while a person is still imprisoned, as opposed to being

on parole like Rashid was, and the filing of an article 10 petition the day after the completion of the maximum prison sentence would bar the return to custody that is permitted by subdivision (h), regardless of how dangerous the person may be. It is precisely because the criminal justice system can "no longer exert[ ] authority" over such a sex offender (majority op at 14 n 9) that the Legislature authorized the Attorney General to seek relief in the civil courts without the unduly burdensome jurisdictional filing requirement that the majority has imposed.

Aside from the implications of Mental Hygiene Law § 10.06 (h), I believe that the majority's strict textual application of "detained" and "currently serving" cannot be reconciled with the time frame set forth in article 10 for the civil management trial. The finder of fact cannot render a determination that a sex offender has a mental abnormality requiring civil management unless it also decides that the respondent is still "detained" under a sentence for a sex crime (Mental Hygiene Law § 10.07 [d]; see id. § 10.03 [g] [1]). Similarly, if the factfinder rules in the State's favor, the court must then assess whether the respondent is a "dangerous sex offender requiring confinement" or a "sex offender requiring strict and intensive supervision" (id. § 10.07 [f]), both of which require current detention for a sex crime (see id. § 10.03 [e], [r]). Yet article 10 contemplates that a trial will generally occur after a sentence has expired: the statute provides that the probable cause hearing be conducted approximately 15 days before an anticipated release date (see id. § 10.06 [g]) and the trial is supposed to commence no more than 60 days later (see id. § 10.07 [a])—i.e., 45 days after the offender's scheduled release. Even if the trial begins before a respondent's sentence is completed, it is doubtful that the offender will still be serving the sentence by the time the jury begins deliberations since article 10 litigation "is often protracted" and almost half of all cases take more than a year from the probable cause determination to reach conclusion (2009 OMH Report at 13).

How, then, will it ever be possible for a factfinder or a judge to say that a sex offender with a mental abnormality is "currently serving a sentence for" a sex crime? In reaching its holding in this case, the majority does not appear to have contemplated how its strict textual approach will apply in future article 10 cases that are timely commenced but cannot be completed before the respondent's underlying sentence expires. Ultimately, the majority's decision will either create interpretative

inconsistencies within the Act or result in different meanings of the same statutory language at various stages of the proceedings.

In my opinion, since "detained" and "currently serving" cannot realistically be interpreted as referring to the present tense throughout the statutory process, the rule for determining civil management eligibility should be whether the offender was serving a sentence on the day the case is assigned to an OMH review team because that is when the offender first receives notice that an article 10 civil commitment process has been initiated (*see* Mental Hygiene Law § 10.05 [e]) and the offender is first denoted as a "respondent" (*see id.* § 10.03 [n]). I am not alone in this analysis, as other judges contemplating the meaning of article 10 have similarly held (*see People ex rel. David NN. v Hogan,* 53 AD3d at 843-844 ["The statutes only require the detained person to be in the agency's custody and nearing release when the initial notice is given, . . . not when the petition is filed . . . . (A) petition could have been filed even had (the) petitioner been at liberty"]). Thus, an article 10 petition will be untimely only if the sentence expires before notice is issued (*see generally Joseph II.,* 15 NY3d at 134-135). I therefore conclude that the article 10 proceeding in this case was timely commenced against Rashid because he was under parole supervision at the time he was notified that his case was being referred to an OMH review team for possible civil management consideration.

By finding Rashid's petition to be untimely, the majority necessarily rules that section 10.06 (h) does not mean what it plainly says; it adopts a new jurisdictional timing rule that cannot be found elsewhere in article 10; it disregards the Legislature's decision to create nonmandatory time periods that do "not affect the validity of the petition" if they are not met (*see* Mental Hygiene Law § 10.06 [a]); it penalizes the Attorney General for undertaking the obligation to consider a case within 30 days; and it fails to recognize that article 10 court proceedings will generally occur after a criminal sentence is completed. Broad ramifications may flow from this decision—article 10 court proceedings have been commenced against over 300 sex offenders (*see* 2010 OAG Report at 14) and we have no information about how many of those respondents were serving their sentences when the petitions were filed. Based on the plain language of section 10.06 (h), it was reasonable for the Attorney General to believe—not only in this case but in others as well—that completion of parole by a person who had been living in

the community would not be an insurmountable impediment to the filing of a petition providing that the notice to the respondent occurred before that person completed the sentence.

For all of these reasons, I would hold that the petition was timely filed because Rashid was under parole supervision when he was informed that his case would be subject to article 10 review procedures.

## IV

Because I have concluded that Rashid was "detained" as defined by Mental Hygiene Law § 10.03 (g) (1) when the article 10 process began, it is also necessary for me to consider whether that detention was for a sex offense.

Penal Law § 70.30 is the only New York statute supplying the rules for how to calculate multiple terms of imprisonment. Under subdivision (1) (b), if two indeterminate prison terms run consecutively, the minimums are added together to produce the new minimum and the maximums are added to produce the new maximum. Because Rashid was serving 8 to 16 years for the 1988 sex offenses when he committed the 2000 robberies and received a new 2-to-4-year sentence, those terms had to run consecutively, even though the sentencing court in the more recent proceeding did not formally make that pronouncement (*see* Penal Law § 70.25 [2-a]; *People ex rel. Gill v Greene*, 12 NY3d 1, 6 [2009]). Thus, Rashid's total sentence was 10 to 20 years, which meant that the sentence (including parole) would not be fully completed until November 2008.

The majority concludes that Penal Law § 70.30 (1) (b) does not apply to the determination of whether a person was serving a sentence for a sex offense for article 10 purposes. It reasons that the statute is irrelevant because article 10 has its own rule for examining whether a sentence for a sex crime is still being served and therefore concludes that Rashid finished his sex offense sentence in 2004, rendering him ineligible under article 10. I disagree.

Article 10 states that a person must be "currently serving" a sentence for a sex offense (*see* Mental Hygiene Law § 10.03 [g] [1]), but it does not contain any provision that directs how to make the "currently serving" determination when an offender is subject to multiple terms of imprisonment, as Rashid was. Nor does article 10 preclude a court from considering the otherwise generally applicable provisions of Penal Law article

70. In the absence of such a restriction, the default calculation rule of Penal Law § 70.30 (1) (b) should govern.

Our decision in *People v Buss* (11 NY3d 553 [2008])—which dealt with the Sex Offender Registration Act (SORA)—supports this conclusion. In *Buss*, the defendant had committed a sex offense in 1983 (before SORA was enacted) and was sentenced to 2 to 6 years. While on parole in 1987, he tried to murder a woman and was charged with attempted murder and first-degree rape and sodomy, among other offenses. He pleaded guilty to attempted murder in satisfaction of the indictment and received a consecutive sentence of 10 to 20 years (producing an aggregate of 12 to 26 years). The issue was whether the new sentence had to be added to the earlier one for the purpose of SORA eligibility, meaning the defendant was still serving a sentence for the 1983 sex offense when SORA became effective in 1996.

We held that the calculation rule of Penal Law § 70.30 (1) (b) was applicable and that the defendant was therefore subject to SORA. Our analysis was straightforward: "the Penal Law provides for a method whereby two or more sentences are *made into one*" and "the result . . . is a single, indeterminate sentence" (11 NY3d at 557) whenever a person is subject to more than one term of imprisonment. We observed that one of the primary goals of SORA was "to protect the public from the danger of recidivism posed by sex offenders" and explained that the advancement of this legislative purpose was "best served by recognizing that a person who is returned to prison while on parole for a sex offense continues to be subject to his sex offense sentence for the duration of the aggregate sentence" since "[c]ommon sense and experience dictate that a defendant's conduct while on parole is a reliable predictor of the risk he poses to society" (*id.* at 558 [citations and internal quotation marks omitted]). Hence, we held that section 70.30 applies to "the question of whether a prisoner who has been given multiple sentences is subject to all his sentences for the duration of his term of imprisonment" (*id.* at 557).

Under a comparable analysis, I believe that the reasoning of *Buss* applies with equal force to article 10 proceedings. Like SORA, article 10 was designed to address public safety concerns (*see* Mental Hygiene Law § 10.01 [d])—the Legislature declared that "recidivistic sex offenders pose a danger to society" (*id.* § 10.01 [a]). As in *Buss*, advancement of this legislative objective is best served by recognizing that sex offenders "continue[ ]

to be subject to [the] sex offense sentence for the duration of the aggregate sentence" (*Buss*, 11 NY3d at 558). Nothing in article 10 convinces me that the Legislature intended to create a different and more favorable sentence calculation rule for dangerous sexual predators with mental abnormalities than for other categories of sex offenders who are required to register under SORA. If that was what the Legislature wanted to accomplish, it would have said so in article 10.

Furthermore, contrary to the majority's conclusion (*see* majority op at 18-19), the definition of "related offenses" does not prevent the rationale of *Buss* from pertaining to this situation. To be sure, that phrase expands the application of the civil management act to individuals who are serving time for non-sex offenses (*see* Mental Hygiene Law § 10.03 [*l*]). But incarceration for a "related offense" is irrelevant to assessing whether a person is still serving a sentence for a "sex offense"—a different and independent category that defines eligibility for civil management. The only way to make the latter determination is to refer to Penal Law § 70.30 (1) (b). Tellingly, the majority never says that Rashid was not, in fact, on parole for the 1988 sex offenses when the article 10 process began. Certainly he was. I would therefore hold that Rashid was still serving his sentence for the 1988 sex offenses when the article 10 process began, which qualified him as a "detained sex offender" within the meaning of Mental Hygiene Law § 10.03 (g) (1).[5]

V

As a final point, we held in *Harkavy I* that the State could not apply article 9 of the Mental Hygiene Law to sex offenders who were serving a sentence when that process began (*see* 7 NY3d at 613-614). But we also explained that article 9 could be used in situations where sentences had expired (*id.* at 614). Thus, although the majority now concludes that article 10 cannot be used against Rashid because his sentence was completed before the petition was filed, nothing prevents the State from seeking to have him involuntarily hospitalized under Mental Hygiene Law article 9 as a mentally ill person who is in need of treatment and is a danger to society (*see* Mental Hygiene Law § 9.27). If Rashid is as impaired and dangerous as the State has alleged, the ironic result here may be commitment proceedings under

---

5. In light of this conclusion, it is unnecessary for me to address whether the 2000 robberies were "related offenses" that would provide an independent basis for an article 10 petition.

article 9 in which Rashid will not be entitled to many of the significant procedural and substantive protections that apply in article 10 cases.

Based on my reading of the civil management act and our decision in *Buss* (11 NY3d 553 [2008]), I would reverse the order of the Appellate Division and allow the article 10 trial to proceed.

SMITH, J. (dissenting). This case, like *People ex rel. Joseph II. v Superintendent of Southport Correctional Facility* (15 NY3d 126 [2010]), presents narrow issues of statutory construction, not the substantive question of how far Mental Hygiene Law article 10 goes, or constitutionally may go, in permitting what amounts to preventive detention for dangerous sex offenders. I join Judge Graffeo's dissent because I believe she has correctly analyzed the issues that are before us. In doing so, I do not necessarily imply that I think article 10 does, or constitutionally may, permit the detention of Rashid or other prisoners similarly situated. Neither of the main opinions in this case, as I read them, addresses that issue.

Chief Judge LIPPMAN and Judges CIPARICK, PIGOTT and JONES concur with Judge READ; Judge GRAFFEO dissents and votes to reverse in a separate opinion in which Judge SMITH concurs in another opinion.

Order affirmed, without costs.